# RICHELIEU AND ONTARIO NAVIGATION COMPANY *v.* BOSTON MARINE INSURANCE COMPANY.

## ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MICHIGAN.

No. 296. Argued April 25, 1890. — Decided May 19, 1890.

Where a policy of marine insurance excepts losses and perils occasioned by want of ordinary care and skill in navigation, or by want of seaworthiness, and a statute of the country to which the insured vessel belongs requires all vessels to go at a moderate speed in a fog, and the insured vessel, having a defective compass, is stranded while going at full speed in a fog, and a loss ensues, the burden of proof is on the insured to show that neither the speed ·at which the vessel was running nor the defect in the compass could have caused, or·contributed to cause, the stranding.

The exception in a marine policy of losses occasioned by unseaworthiness is, in effect, a warranty that a loss shall not be so occasioned, and it is therefore immaterial whether a defect in the compass of the vessel which amounts to unseaworthiness was or was· not known before the loss.

·When in a policy of marine insurance it is provided that acts of the insurers or their agents in recovering, saving and preserving the property insured, in case of disaster, shall not be considered as an acceptance of an abandonment, such acts in sending a wrecking party on notice of à stranding of· a vessel, in taking possession of it and in repairing it, if done in ignorance of facts which vitiated the policy, do not amount to acceptance of abandonment; but it is a question for the jury to determine whether such acts, taken in connection with all the facts, and with the provisions in the policy, amounted to such an acceptance.

Although a protest by a master of a vessel after loss is ordinarily not admissible in evidence during his lifetime, yet in this case it was rightfully admitted, because it was made part of the proof of the loss.

A stranded insured vessel, having been recovered and repaired, was libelled and sold for the repairs, neither the owners nor the insurers being willing·to pay for them. In an action between the owners and the insurer to recover the insurance; *Held,* that the record in that suit was not admissible against the insurer to establish acceptance of an abandonment.

THIS was an action upon a policy of insurance, bearing date May 1, 1883, insuring the steamer Spartan, a Canadian vessel of six hundred and seventy-eight tons burden, from April 1 to November 30, 1883. The plaintiff in error, a Canadian cor-

poration, chartered the Spartan in the spring of 1883 to the Owen Sound Steamship Company, also a Canadian corporation or association, and she was being run by that company on the route between Owen Sound on Georgian Bay, Ontario, to Fort William, Ontario, on the north shore of Lake Superior, when the loss occurred. The perils insured against were thus stated in the policy:

"Touching the adventures and perils which the said insurance company is content to bear and take upon itself by this policy, they are of the lakes, rivers, canals, fires, jettisons, that shall come to the damage of the said vessel or any part thereof, excepting all perils, losses, misfortunes, or expenses consequent upon and arising from or caused by the following or other legally excluded causes, viz.: Damage that may be done by the vessel hereby insured to any other vessel or property, incompetency of the master or insufficiency of the crew or want of ordinary care and skill in navigating said vessel and in loading, stowing and securing the cargo of said vessel; rottenness, inherent defects, overloading, and all other unseaworthiness ; theft, barratry or robbery."

The steamer was valued at $50,000 and was insured in all to the amount of $40,000. Her crew consisted of the master, two mates, two engineers, two wheelsmen, four firemen, a full complement in the cabin, and four or five deck hands. She had made three trips from the opening of the season of navigation ; and on the 18th of June, 1883, left Fort William, on her return trip to Owen Sound, and stopped en route at Silver Island on the north shore of Lake Superior, leaving that port at 12.45 P.M., and was stranded on the southwest point of Caribou Island, in Lake Superior, at about two o'clock in the morning of June 19. The evidence tended to show that on this occasion, "for the first time," she laid her course from Silver Island for Passage Island, thence direct for White Fish Point on the south shore of Lake Superior. Between Silver Island and Passage Island a thick fog arose, which continued until after the stranding. She passed Passage Island at 2.30 P.M., thence the chart course lay S. E. by E. ½ E. to White Fish Point, passing about eight miles to the southward of Car-

ibou Island, one hundred and thirty-two miles from Passage Island. About eight o'clock in the evening of June 18, the master retired to his stateroom, leaving the second mate on watch, and gave him the following written instructions:

"Monday Evening.

"Mr. Harbottle: If it continues thick at 10 o'clock P.M. keep her S. E. by E. until 3 A.M.; then keep her S. E. by E. ½ E. small. If it clears continue on your course S. E. by E. ¼ E."

The fog continued dense during Harbottle's watch, and he made the course prescribed until he came off watch about 1 o'clock A.M. on the 19th, running the steamer at full speed, which was twelve or twelve and a half miles per hour, the master testifying that his instructions "were based on the steamer's running on time." At twenty minutes past one in the morning, Wagner, the first mate, relieved Harbottle and took charge, navigating the vessel under the same orders, the fog being so dense, he says, "that you could not see anything." There was no lookout forward; no one else on deck during either watch, beside the mate and the wheelsman; no soundings were taken; and the steamer was kept running at her full rate of speed, carrying her regular steam of forty-five pounds, her maximum pressure being forty-seven pounds. She struck on the southwest point of Caribou Island, in Canadian waters, though she should have passed seventeen miles to the southward of that island. Upon the ordinary course from Passage Island to White Fish Point, she would have passed about eight miles south, but the testimony tended to show that she took a course somewhat southerly of the most direct course between the two points, which should have carried her some seventeen miles south.

Notice of the disaster and request for assistance were sent by the master to the insurers' agents, who received it, June 22, and sent to the aid of the Spartan a tug and wrecking expedition, under command of Captain Swain, which left Detroit June 23, and arrived at Caribou Island June 25. June 26, plaintiff sent a telegram to the insurance agent at Toronto, who was the broker who negotiated this insurance, through defend-

ant's agents at Buffalo, as follows : " Spartan ashore on Caribou Island, and this company beg to inform you that they abandon the boat and claim a total loss. Please inform the underwriters."

The steamer was brought to Detroit, as alleged on the one side, by the order of her master, and there docked and repaired under his instructions, which is denied on the other. The cost of rescuing the steamer and towing her to Detroit was $7455.13, which was paid by the underwriters. It is in dispute as to who ordered the repairs, or claimed or exercised control over them or the steamer, or directed where she should be brought, but it is not shown that either plaintiff or defendant did. The repairs were made by the Detroit Dry Dock Company, and completed in September, at a cost of from $23,000 to $24,000. In November, plaintiff served on the insurers proofs of loss, verified November 3, 1883, in which it is stated: " That the said vessel, in the prosecution of a voyage from Fort William, on the north shore of Lake Superior, in the Province of Ontario, to Owen Sound, on Georgian Bay, in said Province of Ontario, at about two o'clock on the morning of the 19th of June last, in a fog, ran ashore on the southwest shore of Caribou Island, and became a wreck and total loss, and was duly abandoned by her owners to her insurers, as will appear by certified copy of the protest of her master and mariners, heretofore served upon you; in consequence of which the said Richelieu and Ontario Navigation Company suffered damage, sustained loss or damage, within the perils insured against under the said policy No. 1965, to the amount of ten thousand dollars, as will further appear by particular statement herewith."

The agents of the insurers knew nothing of the facts attending the stranding, except what the protest showed, until after March, 1884. Up to that time plaintiff and the underwriters had been negotiating for a settlement of the loss, but could not agree upon the liability for duties upon the repairs, but after discovery of the facts the defendant and the other insurers refused to pay. Upon the trial the jury found a verdict for the defendant, on which judgment was entered.

The opinion of Judge Brown, the district judge, on the motion for a new trial, will be found in 26 Fed. Rep. 596.

The cause was brought to this court by writ of error, and errors were assigned as follows : That the Circuit Court erred

1. In ruling that no authority was shown on the part of Captain Gibson to bind the defendant in respect to the repairs made upon the steamer Spartan.

2. In striking out all the testimony respecting the acts and statements of Gibson.

3. In excluding this question put by plaintiff's counsel to the witness Patterson : " Q. What is the custom of Canadian vessels about carrying a lookout forward ? "

In refusing to instruct the jury according to the requests made by plaintiff's counsel, as follows :

4. *First.* " If the jury find that the Spartan, while navigating Lake Superior on June 19th, 1883, and while a dense fog prevailed, was stranded on Caribou Island, and that the insurers were promptly notified of the disaster, and that proper proofs of loss were furnished to the insurers, then the plaintiff has made a case which *prima facie* entitles it to a verdict in this case."

5. *Second.* " The stranding of the Spartan on Caribou Island while a dense fog was prevailing was an accident which is *prima facie* covered by the policy and for which the insurers are *prima facie* liable."

6. *Third.* " If the jury find that the fog contributed proximately to the stranding of the Spartan, then the insurers are liable for the loss caused by such stranding."

7. *Fourth.* " There is no evidence in the case which even tends to prove the unseaworthiness of the Spartan except in regard to her compass, and if the jury find that the compass had not varied more than vessels' compasses ordinarily do, that the steamer had been navigated by the same compass without trouble from the time she left La Chene, on the St. Lawrence River, up to the time of the disaster, and that the officers of the steamer at the time she started upon the voyage on which the stranding took place believed the compass to be reliable, and had reason for so believing, then the insurers

would not be relieved from liability on account of any supposed defect in the compass."

8. *Fifth.* "If the jury find that the insurers received the notice of abandonment which has been offered in evidence, and that without notice to the owners of the steamer they sent Captain Swain with a wrecking expedition to her rescue, and that Captain Swain brought her to Detroit for repairs, and was paid for so doing by the insurers; that the steamer was subsequently surveyed for repairs by the insurers and repaired, and that the owners never interfered with the making of the repairs, then the jury may consider these facts as evidence of an acceptance of the abandonment."

9. *Sixth.* "If the jury find that the insurers, upon receiving notice of the abandonment from the owners, sent a rescuing expedition for the purpose of rescuing the Spartan and taking her to a place of repair, and that the Spartan was gotten off by the wreckers and brought to Detroit for repairs and was there repaired without any notice whatever to the plaintiff, and that the plaintiff never interfered with or exercised any control over or made any claim to said steamer after their abandonment, then the jury may consider these facts as evidence tending to prove an acceptance of the abandonment on the part of the insurers."

10. *Seventh.* "If the jury find that the insurers sent the wrecking expedition to the Spartan with the intention of rescuing and repairing her without consulting the plaintiff, then it was the duty of the insurers to repair her within a reasonable time and tender her back to the owners free from all liens for such repairs. Their failure to do so is evidence of an acceptance of abandonment and their liability to pay as for a total loss."

11. *Eighth.* "If the jury find that the insurers brought the Spartan to Detroit with the intention of repairing her, and that she was subsequently repaired without interference on the part of the plaintiff; that the insurers failed to pay for said repairs, but allowed the steamer to be libelled and sold by the court of admiralty to satisfy the lien for such repairs without notice to the plaintiff, then this would amount to an acceptance of abandonment."

12. *Ninth.* "If the jury find that there was an actual or constructive acceptance of the abandonment, then the plaintiff is entitled absolutely to recover as for a total loss."

And in instructing the jury as follows:

13. "The law of Canada provides that all vessels shall run in a fog at a moderate rate of speed; and I do not undertake to direct you one way or the other in regard to this fact — that is, the rate of speed — but merely to say in general terms that if you find that the loss was occasioned by the excessive speed of the vessel, or by her want of a lookout, or by the defects of the compass, the defendant is not liable."

14. "With regard to the defective compass, the master and crew state in their protest that they attribute the loss to a defective compass, and while that statement is not binding upon the plaintiff, and while the plaintiff is not estopped, as we say, or prevented from showing that the loss is attributable to other causes, it undoubtedly is entitled to considerable weight."

15. "In case you shall find, as I have said before, that this loss was occasioned by a defective compass, the defendant is entitled to your verdict. On the other hand, if you shall find that the loss occurred through peril of the sea and from no want of skill in navigation and no want of competency in the master or insufficiency of the crew and from no fault on the part of the vessel, then your verdict should be for the plaintiff."

16. "I charge you, as requested by the defendant, that under the policy of insurance in this case the expense of bringing her to Detroit must be shown by the plaintiff to have been occasioned by the risk against which the defendant had insured the steamer; and if the stranding of said steamer and the expense incurred in effecting her relief resulted from any incompetency of the master or insufficiency of the crew or want of ordinary care and skill in navigating said vessel, or from any unseaworthiness of said vessel, then the plaintiff cannot recover."

17. "I charge you, as requested by the defendant in his seventh request, that under the evidence in this case the

burden of proof is upon the plaintiff to show that the stranding of said steamer could not have been guarded against or prevented by the ordinary exertions of human skill and prudence."

18. "As the Spartan was violating the statute laws of Canada in running at full speed in a dense fog, the plaintiff must show affirmatively that neither the speed of the steamer nor the defects of the compass could have caused or have contributed to cause the stranding of the steamer. The burden of proving a loss of this kind is upon the plaintiff. There is no presumption that the loss was occasioned by the peril insured against by the defendant."

19. "If there were any defects in the compass, known or unknown, rendering it unsafe or unsuitable for use in Lake Superior, and the stranding of the vessel was caused by, consequent upon, or arose from such defect in the compass, the vessel was not seaworthy for Lake Superior navigation, whatever her fitness for navigation elsewhere, and the plaintiff cannot recover."

*Mr. F. H. Canfield* for plaintiff in error.

The rulings of the court below which are now presented for review, may be considered under two distinct heads:

1st. Those which relate to the cause of the loss.

2d. Those which relate to an acceptance of the abandonment.

I. In behalf of the plaintiff we submit that the stranding of the steamer at night in a fog, with a heavy sea, was *prima facie* a loss by a peril insured against, and we therefore insist that the court erred in not charging the jury in accordance with plaintiff's first, second and third requests, which were to the effect that the stranding of the Spartan on Caribou Island, while a dense fog was prevailing, was an accident which was *prima facie* covered by the policy, and for which the insurers were *prima facie* liable; and that if the fog contributed proximately to the stranding, the insurers would be liable.

It is clear from the charge given and also from the opinion of the court upon the motion for a new trial, that the court

departed from the rule applicable in cases of marine insurance, which regards only the proximate cause of the loss, and according to which, if the proximate cause of the loss was a peril insured against, the underwriters would be liable, although such proximate cause may have been brought into operation by a peril not insured against; or, to state the rule in another form, if the proximate cause of the loss be a peril insured against, the underwriters will be liable, although other perils not covered by the policy may have contributed to bring about the loss. *Columbia Ins. Co.* v. *Lawrence*, 10 Pet. 507; *Waters* v. *Merchants' Ins. Co.*, 11 Pet. 213; *Peters* v. *Warren Ins. Co.*, 14 Pet. 99; *Orient Ins. Co.* v. *Adams*, 123 U. S. 67; *General Mutual Ins. Co.* v. *Sherwood*, 14 How. 351; *Dudgeon* v. *Pembroke*, L. R. 9 Q. B. 581; *S. C.* 2 App. Cas. H. L. 284; *Davidson* v. *Burnand*, L. R. 4 C. P. 117; *Ionides* v. *Universal Ins. Co.*, 14 C. B. (N. S.) 259.

We submit, that by the true interpretation of this policy the insurers take upon themselves *all* the perils of the lakes, rivers, etc., that may come to the damage of the vessel, and that they are responsible for all losses except those "consequent upon" "arising from" or "caused by" the excepted perils; and if the underwriters seek to defend upon the ground that there was "a want of ordinary care and skill" in the navigation, the burden of proof is with them to show that such want of ordinary care and skill was the proximate cause of the loss.

In *Union Ins. Co.* v. *Smith*, 124 U. S. 405, the policy was identical with the one at bar, and it was there held that the defendant, having set up in its answer that the loss was occasioned by want of ordinary care in managing the vessel, it was not error to charge the jury that such want of ordinary care must be shown by a fair preponderance of proof on the part of the insurers.

Again, these exceptions are to be construed most strongly against the underwriters, they being the party by whom, and for whose benefit, the exceptions were introduced into the policy. *Palmer* v. *Ins. Co.*, 1 Story, 360; *Ins. Co.* v. *Wright*, 1 Wall. 456. 468; *Tudor* v. *New Eng. Ins. Co.*, 12 Cush. 554.

Even in actions of tort the negligence of the plaintiff will not defeat his recovery, unless it contributed proximately to his injury. Beach on Contributory Negligence, pp. 7, 9, 27, and cases there cited: *Railroad Co.* v. *Stout,* 17 Wall. 657.

Nor is the rule applicable to common carriers who have negligently exposed the goods intrusted to their care to a peril excepted in their bill of lading, to be applied to cases of marine insurance. A carrier becomes an insurer of the safe delivery of goods, unless prevented by the act of God or the public enemy, or unless the loss results from a cause excepted in the bill of lading. But if the carrier's negligence has exposed the goods to loss from such excepted cause, he is not to be held liable, unless such negligence contributed proximately to the loss. *Railroad Co.* v. *Reeves,* 10 Wall. 176; *Morrison* v. *Davis,* 20 Penn. St. 171; *Denny* v. *New York Cent. Railroad,* 13 Gray, 481; *Daniels* v. *Ballantine,* 23 Ohio St. 532.

Why should the assured in a case like this be held to a stricter rule than the one applicable to carriers under the decision in 10 Wallace above cited?

The decisions of the Admiralty courts cited by the District Judge in his opinion, holding that a violation or a departure from the statutory rules intended to apply in cases of collision, is to be presumed to have contributed to the disaster, have no bearing upon the present case, for the reason that neither those rules nor the doctrine of contributory negligence has any application to the case at bar. *Hoffman* v. *Union Ferry Co.,* 68 N. Y. 385.

The instruction of the court is not to be sustained by reason of the Canadian statute referred to by the District Judge, being chapter 29, 43 Vict. See *Grill* v. *Iron Screw Collier Co.,* L. R. 1 C. P. 600; *The Pennsylvania,* 19 Wall. 125.

If it was intended that these statutory rules should be incorporated into this policy, why is it not so stipulated?

What is ordinary care in a case like this is a question of fact for the jury, to be determined by the evidence as to the manner in which such steamers are ordinarily navigated. And whether there was a want of ordinary care in navigating the

Spartan at her usual speed upon the broad lake — with no other vessel in the vicinity, simply because a fog prevailed, was a question for the jury.

II. The court erred in charging the jury that "under the evidence in this case the burden of proof is upon the plaintiff to show that the stranding of the steamer could not have been guarded against or prevented by the ordinary exertions of human skill and prudence."

We claim this to be erroneous for two reasons:

(1) Because it puts the burden of proof upon the wrong party. As already shown, but for the exceptions in the policy, negligence on the part of the officers and crew would be no defence. And under the decision of this court in *Union Ins. Co.* v. *Smith,* 124 U. S. 405, already cited, the burden is with the *defendant,* if it seeks to bring itself within the exception of a want of ordinary care in the navigation of the vessel, "to establish negligence by a fair preponderance of proof."

(2) There is nothing in the law of marine insurance even under such a policy as this, which relieves the insurer from liability, although the insured may have failed to use all ordinary skill and prudence to prevent disaster. Unless the want of such skill and prudence was the *proximate* cause of the loss, it would be no defence.

III. The defence of unseaworthiness relates wholly to the compass.

It should not be forgotten that the policy of insurance in this case was a *time* policy, and that there is no warranty of seaworthiness in a time policy. If the vessel was seaworthy at the time the policy was issued, no subsequent unseaworthiness would affect the liability of the insurers. *Thompson* v. *Hopper,* 6 El. & Bl. 171; *Merchants Ins. Co.* v. *Morrison,* 62 Illinois, 242; *Gibson* v. *Small,* 4 H. L. Cas. 353; *Dudgeon* v. *Pembroke,* L. R. 9 Q. B. 581.

The record shows, beyond all question, that the steamer was seaworthy when the policy was issued. She had been navigated by the same compass during the entire season up to the time of the loss. From Lachine, on the St. Lawrence River, she had been navigated to Owen Sound. From Owen

Sound she had made three trips on her regular route to Port Arthur, running as well by night as by day, encountering much fog, but experiencing no difficulty whatever from the compass. The owner of an appliance or a vessel, which has been known to operate safely and satisfactorily in a variety of circumstances, may continue to use it without subjecting himself to the charge of negligence simply because an accident occurs subsequently, he being in ignorance of its actually having become defective. This is a proposition sustained by good sense and judgment, and is recognized by the authorities. *Burke* v. *Witherbee*, 98 N. Y. 562; *Loftus* v. *Union Ferry Co.*, 84 N. Y. 455; *Cleveland* v. *New Jersey Steamboat Co.*, 68 N. Y. 306; *Dougan* v. *Champlain Transportation Co.*, 56 N. Y. 1.

IV. The court erred in admitting the protest in evidence.

2 Arnould on Ins. 1353, says: "The protest of the captain, so long as he is living, is in no case evidence on the one side or the other; the only use that can be made of it is to contradict his testimony if he vary from it; it cannot be adduced to disprove the grounds of the condemnation of a foreign prize court; nor will the brokers, having shown it to the underwriters with other papers relating to the loss, on demand of payment, make it evidence as against the assured." See also *Senat* v. *Porter*, 7 T. R. 158.

That the admissions of the master, not made as part of the *res gestæ*, are not admissible in evidence, is well established by the authorities. *Packet Co.* v. *Clough*, 20 Wall. 528; *Am. Steamship Co.* v. *Landreth*, 102 Penn. St. 131; *Ins. Co.* v. *Mahone*, 21 Wall. 152, 157; *Adams* v. *Hannibal &c. Railroad*, 74 Missouri, 553, 557, 559; *Lane* v. *Bryant*, 9 Gray, 245; *Bacon* v. *Charlton*, 7 Cush. 581; *Luby* v. *Hudson River Railroad*, 17 N. Y. 131; *Randall* v. *N. W. Tel. Co.*, 54 Wisconsin, 140; *Bellefontaine Railroad* v. *Hunter*, 33 Indiana, 335.

V. As to the acceptance of the abandonment: We claim that the evidence shows, or at least tends to show, a constructive acceptance by the underwriters. That the taking possession of a vessel, or proceeding to repair her by the underwriters after notice of abandonment, without protest or notice

of their intentions, is evidence of an acceptance, is recognized by all the authorities. *Cincinnati Ins. Co.* v. *Bakewell*, 4 B. Mon. 541, 557; *Provincial Ins. Co.* v. *Le Duc*, L. R. 6 P. C. App. 224; *Northwest Transportation Co.* v. *Continental Ins. Co.*, 21 Fed. Rep. 171; *Northwest Transportation Co.* v. *Thames and Mersey Ins. Co.*, 59 Michigan, 214; *Richelieu and Ontario Navigation Co.* v. *Thames and Mersey Ins. Co.*, 40 Northwestern Rep. 758; *Copeland* v. *Phœnix Ins. Co.*, 1 Wool. C. C. 278; *S. C.* 9 Wall. 461, *sub nom. Copelin* v. *Ins. Co.; Norton* v. *Lexington &c. Ins. Co.*, 16 Illinois, 235; *Shepherd* v. *Henderson*, 7 App. Cas. 49; *Reynolds* v. *Ocean Ins. Co.*, 22 Pick. 191; *S. C.* 1 Met. 160.

Defendant's counsel may argue that the underwriters were ignorant of the circumstances surrounding the loss, and therefore their taking possession of the steamer after notice of abandonment and getting her off, would not amount to acceptance of abandonment.

If the insurers were in fact ignorant of the circumstances surrounding the loss, (which is not conceded,) they could not go on indefinitely under the notice of abandonment. It was their duty to make inquiry. Mere ignorance on their part of the circumstances surrounding the loss would not prevent an acceptance of the abandonment, which their actions would otherwise indicate. They are to be judged by their acts.

*Mr. Henry H. Swan* for defendant in error

*Mr. Joseph H. Choate* for plaintiff in error.

It is impossible to sustain the general verdict which the jury found upon the several alternative propositions of law contained in the charge, which were duly excepted to. Where several distinct grounds of liability on the part of the defendant are submitted to the consideration of the jury, if either was improperly submitted, and the verdict is a general one, the judgment will be reversed, unless it appear that some one of the others was so clearly established by uncontroverted evidence as to have rendered it the duty of the court to direct

a verdict for plaintiff, and this for the obvious reason that it is impossible to determine upon which of the several alternative grounds which were left to them, the jury based the general verdict. *Baldwin* v. *Burrows*, 47 N. Y. 199; *Maryland* v. *Baldwin*, 112 U. S. 490, at p. 493.

The following distinct grounds of liability on the part of the defendant were submitted to the consideration of the jury:

*First.* If they found that there were any defects in the compass, known or *unknown*, rendering it unsafe for use on Lake Superior, and the stranding was caused by such defects.

*Second.* If they found that the stranding occurred by the vessel's being navigated with excessive speed.

*Third.* If they found that the loss was occasioned by the want of a lookout.

*Fourth.* If it resulted from the incompetency of the master.

*Fifth.* If it resulted from insufficiency of the crew.

*Sixth.* Or if it resulted from want of ordinary care and skill in navigating the vessel.

Forasmuch, therefore, as this general verdict rests upon these six alternative propositions, and some of them certainly were improperly submitted, and it is impossible to say that the verdict was not found upon those so improperly submitted, the judgment must be reversed, and a new trial ordered.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

In *Liverpool Steam Co.* v. *Phenix Insurance Co.*, 129 U. S. 397, 438, it is said: " Collision or stranding is, doubtless, a peril of the seas; and a policy of insurance against perils of the seas covers a loss by stranding or collision, although arising from the negligence of the master or crew, because the insurer assumes to indemnify the assured against losses from particular perils, and the assured does not warrant that his servants shall use due care to avoid them." But in the case at bar, there

is an express exception of all perils and losses occasioned by the want of ordinary care and skill in navigation and of sea-worthiness.

The Spartan was a Canadian vessel and was navigating Canadian waters between two Canadian ports, and was bound to comply with the laws of Canada. The Canadian statute put in evidence (Vol. I, Stats. Canada, 1880, p. 236) is entitled ":An act to make better provisions respecting the navigation of Canadian waters," and prescribes certain rules, among them that every ship, whether a sailing ship or steamship, shall go at a moderate speed in a fog, mist or falling snow, and shall not be exonerated by anything in the rules from the consequences of any neglect to keep a proper lookout, or of the neglect of any ordinary precaution, or precaution required by the special circumstances of the case. These statutory rules correspond with those revised by an order of Council in England in August, 1879, (see 4 P. D. 241,) and prescribed by Congress, Rev. Stat. sec. 4233; Act March 3, 1885, 23 Stat. 438; and recognized as international rules, *The Belgenland*, 114 U. S. 355, 370; *The Scotia*, 14 Wall. 170. Section seven of the Canadian statute provides that " In case any damage to person or property arises from the non-observance by any vessel or raft of any of the rules prescribed by this act, such damage shall be deemed to have been occasioned by the wilful default of the person in charge of such raft or of the deck of such vessel at the time, unless the contrary be proved, or it be shown to the satisfaction of the court that the circumstances of the case rendered a departure from the said rules necessary, and the owner of the vessel or raft, in all civil proceedings, and the master or person in charge, as aforesaid, or the owner, if it appears that he was in fault, in all proceedings, civil or criminal, shall be subject to the legal consequences of such default."

In *The Pennsylvania*, 19 Wall. 125, it was held that where a vessel has committed a positive breach of statute, she must show not only that probably her fault did not contribute to the disaster, but that it could not have done so. And this was but the statement of the settled rule in collision cases.

In this case, in view of the seventh section of the Canadian statute, and the fact that perils occasioned by the want of ordinary care and skill or of seaworthiness were excepted by the policy, the same rule is applicable; hence, the burden was on the plaintiff to show that neither the speed of the steamer nor the defect of the compass could have caused, or contributed to cause, the stranding. If it appeared that the misconduct or unseaworthiness was *causa sine qua non*, it was an excepted peril, and that, as stated by Judge Brown, "ought to suffice for the exoneration of the underwriter in a case where a steamer, equipped with a compass known to be defective, is driven in a dense fog, with unabated speed, and in direct violation of a local statute, upon an island lying but eight miles' off her usual track." We think there was no error in giving the eleventh instruction asked by the defendant, and forming the subject of the eighteenth assignment of error. And this disposes also of the sixteenth and seventeenth errors assigned, as the burden was upon the plaintiff to show that the stranding and its consequent losses, misfortunes and expenses were caused by perils insured against, and as to the perils consequent upon and arising from or caused by the want of ordinary care and skill in navigating the vessel, plaintiff was its own insurer.

And the same result must attend the fourth, fifth and sixth errors assigned, which question the refusal of the court to instruct the jury, as requested in the first, second and third of the plaintiff's instructions, that the stranding of the Spartan, while a dense fog was prevailing, was an accident which was *prima facie* covered by the policy, and for which the insurers were *prima facie* liable, and that if the fog contributed proximately to the stranding, the insurers would be liable.

The jury were entitled to draw their conclusions, not from a part, but from the whole, of the facts in the case, and the difficulty in these instructions is that they are based upon a partial view of the testimony. It was necessary to the plaintiff's case that it should appear from the whole proof that the loss was not occasioned by the want of ordinary care by the master, or on account of unseaworthiness, and was not within

exceptions contained in the policy, against which plaintiff was not insured. *Union Insurance Company* v. *Smith*, 124 U. S. 405. The jury were the judges of all the facts proved; and the court charged that if they found that the vessel "was carried ashore by the current or by any mysterious cause which you are unable to explain, then the loss will be within the policy and the plaintiff would be entitled to recover;" and again, "if you find that this vessel was stranded by reason of want of ordinary care and skill in her navigation or by reason of a defective compass, the plaintiff is not entitled to recover; on the other hand, if you find that she was stranded by circumstances, by reason of the current or by perils of the sea — any other peril of the sea — then the plaintiff would be entitled to your verdict;" and also: "Stranding is one of the perils insured against in the policy, and if the jury find that the stranding was the proximate result of the fog or currents of the lake prevailing, then the owners of the steamer have made a case which entitles them to your verdict in this case."

It appears to us that this branch of the case was left to the jury in a manner in respect to which the plaintiff has no ground of complaint. Certainly the state of facts disclosed by the record precludes the claim that instructions more favorable to the plaintiff could reasonably have been given, and this is illustrated by cases cited.

*Bazin* v. *The Steamship Company*, 3 Wall. Jr. C. C. 229, 239, was a suit for loss of merchandise under a bill of lading, which absolved the carrier from "accidents from machinery, boilers, steam, or any other accidents of the seas, rivers and steam navigation, of whatever nature or kind soever." The steamer was wrecked on Cape Race in a snow-storm, under the following circumstances: "She struck the point of Cape Race — up to that time she continued perfectly seaworthy. If she had not struck, at the average rate of our passage, we would have been in Philadelphia in five days more. The steamer was wrecked. We backed off the point of Cape Race, and run her on shore to save the lives of the passengers, and to keep her from sinking. There was no tempest; she struck in a dense fog — and the sinking of the vessel, and the dam-

age done, resulted from her striking the cape." "Here, then," said Mr. Justice Grier, "we have no other reason given by the captain, nor any testimony whatever, as to how or why this great mistake of running against a cape occurred. The answer and the witness *both seem* to assume that running against a cape or a continent is one of the usual accidents and unavoidable dangers of the sea. That cannot be termed an '*accident* of the sea,' within the exceptions of the bill of lading, which proper foresight and skill in the commanding officer might have avoided. If the compass on the new iron vessel was not sufficiently protected to traverse correctly, the vessel was as little seaworthy as if she had no compass — and this should have been carefully ascertained before she started on her voyage. If there was no fault in the compass, then it is very evident that the officer who is thirty or forty miles wrong in his calculation, and driving through a thick fog with a full head of steam, and first discovers his true position by running on an island, a cape or a continent, has neither the skill nor the prudence to be entrusted with such a command — and for want of such an officer the vessel is not seaworthy. . . . That a steamboat has been either ignorantly, carelessly or recklessly dashed against a cape in a thick fog, cannot be received as a plea to discharge the carrier."

In *The Kestrel*, 6 P. D. 182, the master was suspended by the Wreck Commissioner, with the concurrence of two captains sitting as assessors, because of the stranding of the steamship Kestrel, by reason of negligent navigation, and this decision was affirmed by the Court of Appeal, Mr. Justice Hannen and Sir Robert Phillimore, assisted on the hearing by two of the Elder Brethren of the Trinity House.

The Wreck Commissioner, among other reasons for his report, said : "It appears to us that the master is in this dilemma : either the weather was so foggy that it was not possible to see the island until they were within a ship's length of it, and in that case he would not have been justified in going at full speed, which we are told was ten knots an hour; or it was not very foggy, and in that case it is difficult to account for the island not having been seen until they were

within a ship's length of it, unless indeed there was a very bad lookout being kept on board. In either case the master would seem to have been guilty of a neglect of the ordinary precautions required from seamen for the safe navigation of their vessels."

The Court of Appeal held that the master was guilty of a wrongful act in running the vessel at such a rate of speed as he did in the state of the weather which existed, and also in that he continued to steer the course he did in a fog.

The exceptions in this policy protect the insurer against the excepted perils, as a shipper is protected under a bill of lading from loss to which the negligence of the carrier has contributed. And, as already remarked, if the peril was caused by negligence or unseaworthiness, notwithstanding it was the fog which prevented the mate from seeing the island, the predominating and efficient cause was the negligence or unseaworthiness, and must be regarded as the proximate cause, under the circumstances. *Waters* v. *Merchants' Louisville Ins. Co.*, 11 Pet. 213.; *Insurance Co.* v. *Transportation Co.*, 12 Wall. 194, 199.

The unseaworthiness especially relied on was the alleged defect of the compass.

The plaintiff in error complains of the refusal to give the fourth instruction asked by his counsel, as follows:

" There is no evidence in the case which even tends to prove the unseaworthiness of the Spartan except in regard to her compass, and if the jury find that the compass did not vary more than vessels' compasses ordinarily do, that the steamer had been navigated by the same compass without trouble from the time that she left La Chene, on the St. Lawrence River, up to the time of the disaster, and that the officers of the steamer at the time she started upon the voyage on which the stranding took place believed the compass to be reliable, and had reason for so believing, then the insurers would not be relieved from liability on account of any supposed defect in the compass."

Exceptions were also taken to the parts of the charge italicized in the following:

"Upon the question of speed I will have a word to say, although it is covered, so far as the law of the case is concerned, by my general charge, that if you find the loss occurred by her being navigated at an excessive speed, there can be no recovery; still it is for you to judge whether, under all the circumstances of the case, she was navigating at too great a speed. *The law of Canada provides: 'That all vessels shall run in a fog at a moderate rate of speed.'* Now, it strikes me — but the question is one for your determination — that a vessel is not under an obligation while navigating the open lake to slacken her speed because of a fog unless there is some reason to apprehend collision with another vessel, or unless the vessel is so near the shore or known to be so near the shore that she might run upon it, unless she was navigated at a less rate of speed, and if this compass had been a proper compass, and there was no reason to think it was otherwise, I should feel loth myself to charge the vessel with fault on account of excessive speed. On the other hand, if this compass were known to the captain, or he had good reason to believe it was defective, then it would strike me that in passing in the neighborhood of Caribou Island he should have directed the speed of the steamer to be slowed. But, as I said before, gentlemen, that is a question for your consideration, *and I do not undertake to direct you one way or the other in regard to this fact, but merely to say in general terms that if you find that the loss was occasioned by the excessive speed of the vessel or by her want of a lookout or by the defects of the compass, the defendant is not liable. With regard to the defective compass, the master and crew state in their protest that they attribute the loss to a defective compass, and while that statement is not binding upon the plaintiff here and while the plaintiff is not estopped, as we say, or prevented from showing that the loss is attributable to other causes, it undoubtedly is entitled to considerable weight.* On the other hand, it is shown that the vessel had navigated from Owen Sound up to Sault Ste. Marie and from the Sault up to Port Arthur with this compass, and that no unusual deviation had been detected, except that the captain thought the compass was a little slow, as he said. Now, then, gentle-

men, *in case you shall find, as I have said before, that this loss
was occasioned by a defective compass, the defendant is entitled
to your verdict.    On the other hand, if you shall find that the
loss occurred through peril of the sea and from no want of skill
in navigation and no want of competency in the master or
sufficiency of the crew and from no fault on the part of the
vessel, then your verdict should be for the plaintiff."*

The court also instructed the jury:

"The stranding of said steamer at a point 17 miles out of the
course on which said steamer was running in navigating the
distance of about 130 miles is *prima facie* evidence that
the compass was defective, and throws the burden of proving
that the compass was correct upon the plaintiff.

"I charge you, as requested by the plaintiff in his eighth
request, that the jury are entitled to consider the fact that the
Spartan had been successfully navigated by this compass dur-
ing the season up to the time of her stranding, and that on
her final trip she had made a good course from Fort William
to Silver Island and from Silver Island to Passage Island, and
that she was upon her usual course when she passed the Que-
bec, as evidence tending to show that the officers had reason
for believing that the compass was a proper one, and to rebut
the charge that they were negligent in using that compass.

"The steamer is presumed to have been seaworthy, and that
her officers were competent to navigate and manage her, and
the insurers are not entitled to a verdict on account of unsea-
worthiness unless they prove by a preponderance of evidence
that she was unseaworthy.

"But that is to be construed in connection with the charge
I gave you that the fact that she ran ashore, on a still night,
upon Caribou Island, 17 miles out of her course, raises the
presumption of unseaworthiness, which it devolves upon plain-
tiff to explain."

The court charged that there was but one defect in connec-
tion with the defence of unseaworthiness to which attention
need be called, and that was "the want of a proper compass,"
and, among other things, said: "It was the duty of the plaintiff
to keep the Spartan in a seaworthy condition for the safe

navigation of the waters in which she might be run under the policy. In order to be seaworthy the steamer must have been supplied with a good and reliable compass or compasses, which must have been kept in proper repair and condition for the safe navigation of all waters described in the policy. *If there were any defects in the compass, known or unknown, rendering it unsafe or unsuitable for use in Lake Superior, and the stranding of the vessel was caused by, consequent upon, or arose from such defects in the compass, the vessel was not seaworthy for Lake Superior navigation, whatever her fitness for navigation elsewhere, and the plaintiff cannot recover.*" To the italicized portion of this the plaintiff excepted.

The declaration before the notary by the captain, two mates and wheelsman, states that "from the course taken the steamer should have passed seventeen miles to the southward of Caribou Island." The master had the words "fogs and defective compass" inserted among the causes protested against. There was no lookout, and both that and the rate of speed were contrary to the Canadian statute. The exception of losses occasioned by unseaworthiness was in effect a warranty that a loss should not be so occasioned, and whether the fact of unseaworthiness were known or unknown would be immaterial. This is so stated by the learned District Judge in his opinion on the motion for a new trial, and the decisions referred to fully sustain the position. *Work v. Leathers,* 97 U. S. 379; *The Glenfruin,* 10 P. D. 103; *Union Insurance Company v. Smith,* 124 U. S. 405. But the testimony of the captain and his mates leaves but little, if any, room for doubt that the compass was known to be defective on former trips. The captain testified that he thought the loss was occasioned by a defective compass, but qualified that as merely given as a supposition; that the compass was defective more or less; "it was running in opposite courses;" that when the protest was signed he had the words "fogs and defective compass" inserted; that the loss was occasioned by a defective compass or fogs or the current; that he had experienced on previous trips no more variation than was general on iron vessels; that "another compass on that vessel

might be just the same and different on wooden vessels;" that the stranding must be attributed to the compass or some other cause aboard the vessel; that all compasses on Lake Superior vary more or less at different points; that he could not tell the extent of the variation; that he discovered a little difference from some other vessels in the compass on former trips; that he found the compass out in the other channel; and that every vessel he was on varied there in the same place. The first mate testified that the captain spoke to him about the defect, and said the compass was "a little out; it was not like the compass he had on the Smith;" that the captain laid the stranding solely to the compass; and further, that the compasses "all vary up there; those that have not been adjusted, they vary more at certain points than others; a compass that is adjusted should not vary at all;" that he did not know how much the variation of the compass was; that he steered the small boat by the spirit compass after the stranding, on a S. E. by E. course, and brought up 40 miles from the point for which he steered; "the course actually run must have been $\frac{1}{2}$ south, or something like that, judging from where she fetched up." The second mate, when asked what took them on Caribou Island, answered, "It must have been the fault of the compass." Patterson, the charterer's manager, said that there was more attraction on an iron than on a wooden vessel; that to meet and obviate this, it is usual to adjust compasses; that this compass had never been adjusted; that the Spartan had been fitted out by the plaintiff; that the compass was a little slow in its movements; that he did not know that compasses are specially adjusted to run on Lake Superior. The evidence taken together did not fairly leave the inquiry open as to whether the compass did not vary more than vessels' compasses ordinarily did, or whether the officers, at the time the Spartan started on the voyage, believed the compasses to be reliable or had reason for such belief, any further than was covered by what the court said on that subject. And the slight inaccuracy in the reference to the protest is of no moment.

The eighth, ninth, tenth, eleventh and twelfth assignments of error relate to the question of abandonment. It is not contended that there was any evidence establishing an actual acceptance of abandonment, but it is argued that the evidence tended to show a constructive acceptance. If the loss was the result of a peril not insured against, there was no right to abandon, but it is insisted that if the abandonment is accepted, it is too late to recede, and that an acceptance in ignorance that the loss was occasioned by perils not insured against would be equally binding. And this was so held by the Supreme Court of Michigan, *Richelieu & Ontario Navigation Co.* v. *Thames & Mersey Insurance Co.*, 72 Michigan, 571, which was an action by the present plaintiff against another of the insurers of the Spartan. But the testimony in that case in regard to the repairs was not the same as in the case in hand, as is conceded by plaintiff's counsel, and it is upon that very point of the repairs that the plaintiff chiefly relies to make out the alleged constructive acceptance.

The "sue and labor clause" of the policy was as follows: "It is agreed that the acts of the insured or insurers, or their agents, in recovering, saving and preserving the property insured, in case of disaster, shall not be considered a waiver or an acceptance of an abandonment, nor as affirming or denying any liability under this policy, but such acts shall be considered as done for the benefit of all concerned and without prejudice to the rights of either party." The bill of exceptions shows that the officers and crew of the steamer were unable to get her off, and notice was sent to the owners and charterers, and notice of the loss was also communicated to the underwriters, with a request for assistance, and the underwriters sent a wrecking expedition, under the command of Captain Swain, to rescue the steamer. The request for assistance was received June 22, and the wrecking expedition left Detroit June 23, and reached the Spartan June 25. The telegraphic notice of abandonment was sent to the underwriters on June 26. The policy provided that in case of loss or misfortune it should be lawful and necessary for the assured " to make all reasonable exertions in and about the defence, safeguard and

recovery of the said vessel or any part thereof, without preju-
dice to this insurance;" and in case of neglect or refusal on
the part of the insured to adopt such measures, " then the said
insurers may and are hereby authorized to interpose and re-
cover the said vessel." Captain Swain, who had command of
the wrecking expedition, testified that he had no orders where
to take the steamer when she was got off, and he and the first
mate agreed in testimony that she was towed to Detroit under
the orders of her master. The captain denied that he gave
such orders. The survey was held by Gibson, acting for the
underwriters, and Kirby, for the charterer. The superintend-
ent of the dry dock testified that the dock was engaged by
the captain, "who had something to do with ordering the
repairs," and it appeared that by direction of officers of the
charterer work was done not made necessary by the stranding.
The captain testified that he directed the repairs, because Gib-
son told him both need not be there, and that after that
Crosby, the agent of the underwriters, told him to keep a
strict supervision over the work; that he received no instruc-
tions from any person representing the plaintiff or the char-
terer.

Crosby's evidence was that he gave no orders or instructions
to any person or persons as to the repairs on the steamer, nor
did he assume any responsibility therefor. He did tell the
captain to be careful "to keep what is in the survey separate
from what is outside." There was a dispute between the
plaintiff's manager, the charterer's treasurer, the captain and
Crosby about the payment of duties charged by the Canadian
government on the repairs. And as late as March 24, 1884,
these duties, and the fact that the repairs included work not
specified in the survey, still divided the parties; nor from June
26 to the date of the proofs of loss, November 3, was there
any claim of total loss made, nor did such seem to be the atti-
tude of the parties until defendant refused to pay.

In *Rich. & Ont. Nav. Co.* v. *Thames & M. Insurance Co.*,
*supra*, the Supreme Court of Michigan, in a careful opinion,
held that the company could not defend on the ground that the
peril and loss were not insured against, because, as found by the

jury in that case, the abandonment had been accepted. The plaintiff there rested its case entirely upon the acceptance of the abandonment of the vessel, and the evidence upon that question was, for some reason, largely different from the evidence on this trial.

The court in this case left the question of abandonment to the jury, and the finding was against the plaintiff. No reference is made, in the opinion, on the motion for a new trial, to this question, though it is stated that the opinion "covers all the points made in the briefs of counsel." But certain rulings of the court in relation to this subject are questioned by the alleged errors under consideration.

"Whether the insurer accepts or not is a matter of construction of his words and conduct. Any act done for the purpose of making the most of the property, to whomsoever it may prove to belong, ought not to be construed against the party who thus seeks the common interest." 2 Phillips on Ins. §§ 1692, 1693. Any act of the underwriter in consequence of an abandonment, which could be justified only under a right derived from it, may be decisive evidence of an acceptance. *Peele* v. *Merchants' Ins. Co.*, 3 Mason, 27; *Gloucester Ins. Co.* v. *Younger*, 2 Curtis, 322. The question for the jury was whether upon the evidence, taken in connection with the provisions of the policy, there were any such acts.

As it is not contended that there was any evidence of actual acceptance, and as it clearly appeared that the rescuing expedition was sent before the telegraphic notice of abandonment was given, and as the evidence did not tend to show that that expedition was sent with the intention of rescuing "and repairing" the Spartan, or that the insurers brought the Spartan to Detroit, (if they did bring her,) with the intention of "repairing her," each one of the requested instructions was objectionable.

Assuming that an offered abandonment may be accepted even when the assured has no right to abandon, and that taking possession to make partial repairs, not amounting to indemnity, may not be authorized by the policy, and that taking possession of and holding a vessel for an unreasonable time, or taking

possession after a peremptory abandonment, without qualifi-
cation or reservation, are such acts as imply and constitute an
acceptance of the abandonment and liability for total loss, and
that by the abandonment and acceptance the whole interest is
transferred to the underwriters; *Copelin* v. *Ins. Co.*, 9 Wall.
461; *Shepherd* v. *Henderson*, 7 App. Cas. 49; *Northwestern
Transp. Co.* v. *Thames &c. Ins. Co.*, 59 Michigan, 214; *Cin-
cinnati Ins. Co.* v. *Bakewell*, 4 B. Mon. 541; *Reynolds* v.
*Ocean Ins. Co.*, 22 Pick. 191; the question still remains what
the facts really are in respect to the conduct of the under-
writers. The plaintiff insists that although the captain moved
the Spartan to Detroit and placed her in the dry dock, and to
some extent, if not wholly, superintended the repairs, the
plaintiff was not bound by his action, because he was not
employed by it, but by the charterers, and that the master,
after abandonment, becomes the agent of the insurers.

But it is only after a valid abandonment and the passage of
the title that the captain thus becomes the insurer's agent,
and to concede that here begs the very question which was at
issue. Phillips on Insurance, § 1732.

The first and second errors were that the court ruled that
no authority was shown on the part of Captain Gibson to
bind the defendant in respect to the repairs made upon the
Spartan, and in striking out the testimony respecting Gibson's
acts and statements. Crosby, who was the agent of the insur-
ance company at Buffalo, testified that he " gave no orders or
instructions to any person or persons whatsoever as to the
repairs on the steamer, nor did he assume any responsibility
therefor; that he sent Gibson to Detroit to act on the survey
on the Spartan, and afterwards sent him to see that no more
repairs were put on the steamer than were called for by the
survey, as the Spartan had been damaged on previous occa-
sions and not properly repaired;" and further, that "Mr. Gib-
son was sent by the insurers from Buffalo to hold a survey
on the steamer before she was repaired." This is all the
evidence bearing on Gibson's authority, and the court was
justified in its action. Why Gibson was not called as a wit-
ness does not appear.

It is urged, thirdly, that the court erred in excluding the question put to the witness Patterson : " What is the custom of Canadian vessels about carrying a lookout forward ? " The Canadian statute provided that every steamer should, in a fog, mist, or falling snow, go at a moderate speed, and that nothing in the rules prescribed should exonerate any ship, or the owner, or master, or crew thereof from the consequences of any neglect to keep a proper lookout, etc.

In *The Farragut*, 10 Wall. 334, 338, it was held that the rule laid down by Congress to the same effect intimated that the lookout was one of the ordinary precautions which a careful navigation involved ; and Mr. Justice Bradley, delivering the opinion of the court, said : " A lookout is only one of the many precautions which a prudent navigator ought to provide ; but it is not indispensable where, from the circumstances of the case, a lookout could not possibly be of any service." Evidence of a custom to run at full speed in a dense fog, without a lookout, and contrary to the statute, would be clearly inadmissible, and would be of no avail if established.

It is also objected that the protest was admitted in evidence. That protest consists of the statement signed by the master, mates and wheelman, and the declaration of the notary that he protests at the request of the master, as well on his own behalf as on the behalf of the owners, freighters, officers and crew, against all and singular the cause and causes operating as aforesaid, etc., and more especially " against the storm and heavy winds and gales, high and dangerous seas, fogs and defective compass, experienced on her late voyage; " all of which is certified by the notary public as being a true copy filed in his office. Undoubtedly the protest of the captain, so long as he was living, would not be evidence on one side or the other, unless to contradict him if he varied from it ; and it is said in Arnould on Insurance, (2d ed. by Perkins,) Vol. II, p. 1353, that it would not be made evidence as against the assured, if the brokers showed it to the underwriters with other papers relating to the loss on demand of payment. But it was admissible in this case, not on the ground of agency, but because it was made part of the proofs of loss, being directly referred to

in the proofs in the statement that the vessel ran ashore, " and became a wreck and total loss, and was duly abandoned by the owners to her insurers, as will appear by certified copy of the protest of her master and mariners, heretofore served upon you." Hence the admission of the proofs of loss involved the admission of the explanatory writing. *Ins. Co.* v. *Newton*, 22 Wall. 32.

Finally it is said the court erred in excluding the record in a suit instituted by the Dry Dock Company against the Spartan to enforce a lien for the repairs, because the record was admissible to show the amount due to the Dry Dock Company, and also to show that the steamer was sold to satisfy the decree in that suit, and thereby to establish a constructive acceptance of abandonment by the insurers; but we do not think that it was admissible on either ground. The insurers were not parties to that suit, and the cost of the repairs and the amount of the loss were properly shown by other and competent evidence, while the sale of the vessel had no tendency to prove the acceptance of the abandonment, but rather that the underwriters did not consider themselves bound in the premises. The result is that the judgment of the Circuit Court must be *Affirmed.*