EARNMOOR S. S. Co. *v.* UNION INS. Co.

SAME *v.* CALIFORNIA INS. Co.

*(District Court, S. D. New York. November 28, 1890.)*

1. MARINE INSURANCE—ORDINARY NEGLIGENCE—STRANDING.
    In an action on a marine insurance policy containing no exception for losses occasioned by want of ordinary care, but covering perils of the sea and "all other perils * * * that have or shall come to the hurt * * * of the said ship," ordinary negligence of the ship's master is no defense.
2. SAME—YORK-ANTWERP RULES—GENERAL AVERAGE.
    Rule 5 of the York-Antwerp rules, which provides that, when a ship is intentionally run ashore because she is sinking, no damage caused "by such intentionally running on shore" shall be made good as general average, has no application to an action on a marine policy which provides that general average shall be payable according to the York-Antwerp rules, where the ship was run ashore after she was beginning to sink, to prevent further loss, and no further damage was caused thereby.

3. SAME—SEAWORTHINESS—DRUNKEN PILOT.

    A charge of unseaworthiness by reason of the pilot's intoxication is not sustained where there is no direct evidence of his condition beyond the fact that he had been drinking, and no evidence that he was not perfectly capable when the vessel left port, or, if he was not, that the master knew the fact, and where the pilot, when sober, was one of the best.

4. EVIDENCE—MOTION FOR REARGUMENT—AVERAGE ADJUSTMENT.—NEW OBJECTIONS.

    On motion for reargument, new objections to an average adjustment will not be entertained. Such an adjustment, when made up under the supervision and approval of the insurers' agent, and received and not objected to by them, is *prima facie* evidence of the correctness of the items it contains.

In Admiralty. To recover under marine insurance.
*Wing, Shoudy & Putnam*, for libelants.
*George A. Black*, for respondents.

BROWN, J. The above libels were filed to recover losses by sea perils upon a policy of insurance insuring the steam-ship Earnmoor for one year from March 8, 1888, for $13,500, issued by the respondents, whereby it was provided that the liability of each company should be several, and not joint, for one-half of any sum coming due under the policy. In the policy the hull of the steam-ship was valued at $89,725, and her machinery and boilers at $36,375; total, $126,100. On January 10, 1889, the ship sailed from Philadelphia, bound for St. Thomas, with a cargo of coal. She left her wharf about 6 P. M., in charge of a pilot. About three hours later, when near Edgemoor, proceeding down the Delaware river, she struck a sunken rock, and passed over it. She began to fill rapidly, and, to avoid sinking in deep water, was run ashore on the Delaware side. The voyage was abandoned, the coal, after being removed from the ship, was sold, and the ship removed to a dry-dock and repaired. In the adjustment $43,344.07 was charged to particular average on the vessel, and $44,589.44 was charged to general average; of which $40,510.70 was charged against the vessel, $1,759.15 against freight, and $2,319.59 against cargo. No separation was made in the average adjustment as between the hull and machinery and boilers. The insurers and underwriters were very numerous, of whom the respondents represented about one-ninth in interest. By adjustment for general and particular average, the respondents were each charged with the sum of $4,488.69, to recover which the above libels were filed. The answer, besides certain general denials, averred that the steamer was sailing under a charter which provided that the York-Antwerp rules should govern in the adjustment of general average; that the steamer was unseaworthy at the time of leaving the port of Philadelphia; and that her injuries were caused by such unseaworthiness, and by the negligence of those in command of her, and not by any peril insured against. The charge of unseaworthiness was sought to be proved by showing that the ship's compass was defective, and that the pilot was incompetent by reason of intoxication; the charge of negligence, by similar evidence; and on the ground that, when the pilot's condition was ascertained, it was the duty of the captain to come to anchor in the river, rather than attempt to go on according to his own judgment.

1. *Unseaworthiness.* This charge is not sustained. There is no evidence that the vessel was not seaworthy when the policy attached. The evidence is to the contrary. The evidence with regard to the condition of the compass at the time of the accident is not conclusive, and the compass had nothing to do with the accident, as the vessel was being steered by lights and land-marks, and not by compass. As regards the pilot's condition, there is no direct evidence beyond the fact that he had been drinking. The pilot commissioner subsequently suspended him. The pilot, when sober, was one of the best. No charge of drunkenness was preferred against him. There is no indication in the testimony that when the ship left Philadelphia the pilot was not perfectly capable, or, if not, that the master had any suspicion of the fact. See *Hays* v. *Insurance Co.*, 6 N. Y. Supp. 3; *The Maria*, 1 W. Rob. 95, 110.

2. *Negligence.* Not long before the accident, the pilot twice left the bridge, requesting the master to take charge until his return, and to steer for a certain light ahead. The master, being under apprehension because the ship was run so close to the west bank, each time put the ship's head more to the eastward. The pilot, on his first return to the bridge, brought the ship back again, and upon his second return, while making a similar change, the ship struck. No other explanation than the above is afforded by the testimony. It is perhaps but reasonable to assume that the master had by this time perceived that the pilot had been drinking, and was under the influence of liquor, and feared to trust him. In such a situation he was called on to exercise his best judgment,—whether to resist the pilot openly, and go according to his own judgment, or to come to anchor. The situation was an embarrassing one, and the evidence, as regards all the particular circumstances of the time, place, and exposures, is too meager to warrant me in holding the master chargeable with negligence rather than an error of judgment. Even if it appeared that the circumstances were such that the most prudent course was to come to anchor, and that the master should be held to some extent negligent in going on, the case is certainly not one of willful misconduct, nor of such gross negligence as alone would absolve the insurers from their contract.

It has long been the settled doctrine in cases of marine insurance, as in cases of fire insurance, that under policies of the usual form ordinary negligence is no defense. The general doctrine in this country, illustrated by very numerous adjudications, is that stated by Mr. Justice GRAY in *Liverpool, etc., Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 438, 9 Sup. Ct. Rep. 469:

"A policy of insurance against perils of the seas covers a loss by stranding or collision, although arising from the negligence of the master or crew; because the insurer assumes to indemnify the assured against losses from particular perils, and the assured does not warrant that his servants shall use due care to avoid them."

*Insurance Co.* v. *Sherwood*, 14 How. 351, 362–366; *Phœnix Ins. Co.* v. *Erie, etc., Transp. Co.*, 117 U. S. 312, 323, 6 Sup. Ct. Rep. 750, 1176; *Richelieu Nav. Co.* v. *Boston Ins. Co.*, 136 U. S. 408, 421, 10 Sup. Ct.

Rep. 934. In the case last cited, negligence was held to be a defense, because the policy expressly excepted "losses occasioned by the want of ordinary care and skill in navigation," as well as by barratry. In the present case there was no such exception. The policy was in the usual form, covering the risk of barratry, perils of the sea, and "all other perils, losses, and misfortunes that have or shall come to the hurt, detriment, or damage of the said ship." The policy also contained a clause making the insurers "free from average under three per cent., unless general, or the ship be stranded, sunk, or burned;" and "general average, payable as per foreign custom, if required, or per York-Antwerp rules, is in accordance with the contract of affreightment." It also contained a further provision for the payment of "three-quarters of any sum the assured might have to pay to any other vessel, or the goods and effects on board thereof, in consequence of collision;" *i. e.*, it insured against negligence causing collision. Some English cases of the highest authority are cited by the respondent to the effect that the term "sea peril" should receive no different interpretation in a policy of insurance than in a bill of lading, (*The Xantho*, L. R. 12 App. Cas. 503; *Hamilton* v. *Pandorf*, Id. 518;) and from this it is argued that negligence must be a defense as good and available in an action on a marine policy as in an action upon a contract of carriage. The cases cited, however, expressly negative the conclusion thus sought to be drawn from them. In *The Xantho*, page 510, Lord HERSCHELL says:

"Now I quite agree that in the case of a marine policy the *causa proxima* alone is considered. If that which immediately caused the loss was a peril of the sea, it matters not how it was induced, even if it were by the negligence of those navigating the vessel. It is equally clear that in the case of a bill of lading you may sometimes look behind the immediate cause; and the ship-owner is not protected by the exception of perils of the sea in every case in which he would be entitled to recover on his policy, on the ground that there has been a loss by such perils."

Subsequently, the same view was repeated in *Hamilton* v. *Pandorf*, by Lord WATSON, Id. 526; by Lord FITZGERALD, Id. 528.

3. *York-Antwerp Rules.* Rule 5 of the York-Antwerp rules provides that "when a ship is intentionally run on shore because she is sinking, no damage caused to the ship or cargo and freight, or any or either of them, by such intentionally running on shore, shall be made good as general average." The clause in this policy providing that "general average shall be payable as per foreign custom, if required, or per York-Antwerp rules, if in accordance with the contract of affreightment," was evidently inserted for the benefit of the insured. The vessel, at the time of this loss, was sailing under a charter and under a subcontract of affreightment that adopted the York-Antwerp rules; but in abandoning the voyage the evidence shows that the parties present adopted the most economical course for all, and that all who were reasonably accessible, including the respondents' agent, assented to a general average adjustment. If the point were material, I should think it was competent for the parties to the charter and the ship-owner to waive this provision.

I do not perceive, however, that the clause has any material bearing upon the case, for the reason that the evidence negatives the supposition that there was ·any damage· whatever caused to the ship, the cargo, or the freight by running ashore. The clause relied on is very precise in limiting its application to damage caused by "such intentionally running on shore." But this vessel was run ashore to save her from completely sinking in deep water, after she was filling and beginning to sink. This was done in order to prevent a far greater loss. Running ashore was an act of salvage, and a great benefit to all concerned, including the respondents, by preventing a greater loss.

4. *The Adjustment.* The evidence indicates that the adjustment of general average resulted in advantage to the respondents. The cargo contributed more than it received. Any objection to a general average adjustment on the ground that the loss had been brought about by negligence might help the cargo, but not the ship, nor the respondents as insurers of the ship. The expenses of unloading the cargo and of lightening and floating the ship, even if treated as not within the definition of technical general average, through the lack of the elements of danger and sacrifice, under the special circumstances of this vessel, (*The Alcona*, 9 Fed. Rep. 172; *Bowring* v. *Thebaud*, 42 Fed. Rep. 794,) concerning which I express no opinion, would, nevertheless, so far as they were necessary, and were done for the account and benefit of both the cargo and the ship, be apportioned between the two upon the same equitable principles upon which general average itself rests, (*L'Amerique*, 35 Fed. Rep. 835, 848.)

There is nothing in the evidence to show that the separate valuation of the hull and machinery in this policy affects the amount charged against the respondents in the adjustment. The vouchers have been put in evidence. They were exhibited to the agent of the respondents at the time, and were approved by him, such as were disapproved being rejected, and the reasonableness of the various charges was testified to by competent experts. This is sufficient to warrant a recovery of the amount as adjusted, independently of the adjustment book, which was received only as a convenient summary of the other matters given in evidence. Upon the whole evidence, I am satisfied that the libelants are entitled to at least the amount specified in the adjustment, namely, $4,488.69, against each of the respondents, with interest from the time of the demand, with costs; and decrees may be entered therefor.

---

### ON MOTION FOR REARGUMENT.

(December 20, 1890.)

BROWN, J. On the main question litigated, namely, the degree of the master's negligence, if any, that led to the stranding, I remain of the opinion previously expressed, that there was no such kind or degree of negligence as discharged the insurance policies.

As respects the amount with which the insurers should stand charged,

it does not appear that the amounts allowed are greater than the evidence warrants. Mr. Martin, as the respondents' agent, not only examined and approved the bills which entered into the average adjustment while it was being made, but approved the adjustment when it was made up, and, in answer to the respondents' inquiries, informed them that it was correct. This testimony was explicit upon the trial. The respondents had full knowledge of everything that entered into the adjustment long before, and it does not appear that any objection was made. On the trial the principal bills were presented and marked as exhibits, and a large bundle of the others was produced and presented for inspection with the adjustment. In connection with Mr. Martin's evidence I think the adjustment, under such circumstances, is *prima facie* evidence of the correctness of the items contained in it. The charges for services and commissions were proved, and no evidence against them offered. No question as to the general details was made, or could, under such circumstances, properly be made. To the cargo, as entering into general average, objection was made; but that item benefited the respondents. Now, objections to the freight are sought to be raised; but the aggregate amount charged against the respondents, as insurers of the vessel, is only their proportion of about $83,900, as the whole amount chargeable against the vessel; and this amount remains after excluding the balance of about $2,700 in favor of the freight, complained of in the general average allowance. So that, again, no prejudice to the respondent in this respect is shown.

As to the other items referred to in the affidavits presented on this motion on both sides, it does not seem probable that any injustice has been done to the insurers in adopting the figures of the adjustment as to the extent of their liability. The cargo adjustment gives an advantage to the insurers, if a general average was not warranted. The litigation has been on wholly different questions; and I must decline to enter anew upon the details of the adjustment which were approved by respondents' agent, acquiesced in by them, and not brought forward until after the decision of the cause.

Motion for reargument denied.