BAZIN, (MARSHALL v.) See Case No. 9,-125.

BAZIN v. RICHARDSON. See Case No. 1,-152.

---

## Case No. 1,152.

### BAZIN v. STEAMSHIP CO.

[3 Wall. Jr. 229;[1] 5 Am. Law Reg. 459; 20 Law Rep. 129; 14 Leg. Int. 156; 37 Hunt, Mer. Mag. 449.]

Circuit Court, E. D. Pennsylvania. April Term, 1857.

CARRIERS — BILL OF LADING — LOSS OF GOODS — BURDEN OF PROOF — SHIPPING — CUSTOM—SEAWORTHINESS—DAMAGES.

1. The practice of all the lines of steamships between Liverpool and America, for three years—the lines being two in number—to ship goods in a certain way, is not such a legal custom as will at all affect the terms of a contract in which any other way is specified, though such other way was always set forth in all contracts of the company, it having been the way as set forth in a printed form, and in practice constantly departed from. Nor, though conceded to be a practice well known to persons in Liverpool, would it be regarded in law as probably known elsewhere, e. g., at Havre, nor, however, acted on by persons at Liverpool regarded as having been the implied basis of a contract, made at Havre by persons not from Liverpool, about a shipment to America, though from Liverpool.

[2. A carrier, shipping goods by a different vessel and at an earlier date than that specified in the bill of lading, is liable for loss or damage occasioned by shipwreck, notwithstanding the exception of "accidents of the seas," etc., in such bill of lading.]

[Cited in Marx v. National S. S. Co., 22 Fed. 682; The Bordentown, 40 Fed. 689.]

[3. The loss of goods committed to a carrier, and in possession of his servants, puts the burden of proof on him to show how the loss occurred, and that it was not by their fault, but in consequence of some of the unavoidable accidents excepted in the bill of lading.]

4. The fact that a vessel runs in a fog, and in calm weather, upon a well-known cape, is strong proof of her unseaworthiness, and not rebutted by the admitted fact that she was perfectly new, well built, well rigged and well manned, and in charge of a captain of reputed skill and experience. The conclusion remains that her compass had not been sufficiently tested, or that she was not well commanded, in fact, and for either of these wants she would be unseaworthy.

[Cited in Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U. S. 424, 10 Sup. Ct. 938; The City of Para, 44 Fed. 690.]

5. On a claim of damages for goods lost by a common carrier, the rule is that the carrier shall pay their net value at the place of delivery, with interest from the day when they should have arrived. Anticipated business profits are not allowed.

In admiralty. This was an appeal from a decree in the admiralty [of the district court of the United States for the eastern district of Pennsylvania,] in which a party claimed compensation from ship-owners for his goods lost at sea, while on their vessel. The case was thus:

[Xavier] Bazin, the libellant, was a retailer of French perfumery, in Philadelphia. Being in Paris in 1854, he purchased a large stock of goods for his business in America, which was shipped from Havre to Philadelphia. The respondents [the Liverpool & Philadelphia Steamship Company] were the owners of a line of several steamships sailing between the ports of Liverpool and Philadelphia. For greater regularity and convenience of passengers and traders, the vessels sailed at regular intervals, from these ports; certain vessels being usually named for certain days, when it was convenient so to do; but there not having been, apparently, any contract with the public that special vessels should sail on special days. The steamship company had their agents stationed at Havre, authorized to receive goods meant to be sent from France to the United States, and to issue bills of lading. On the 28th of August, 1854, their agent at Havre gave the libellant a bill of lading, containing the following clause, viz.: "Received in and

[1] [Reported by John William Wallace, Esq., and here reprinted by permission.]

upon the steamship called the Shamrock, now lying in the port of Havre, and bound for Liverpool, eighteen cases of merchandise; to be transhipped at Liverpool on board the Liverpool and Philadelphia steamship City of Manchester, or other steamship appointed to sail for Philadelphia, on Wednesday, the 6th day of September, and failing shipment by her, then by the first steamship sailing after that date, for Philadelphia; and are to be delivered in like good order and condition, at the aforesaid port of Philadelphia." The bill of lading was quite formal in several other specifications, as to the mode of landing the goods, &c., and contained exceptions against loss by "the act of God, the queen's enemies, pirates, restraints of princes and rulers, fire at sea or on shore, accidents from machinery, boilers, steam, or any other accidents of the seas, rivers and steam navigation, of whatever nature or kind soever." The respondents also owned, as one of their line, another steamship called the City of Philadelphia, which was appointed to sail on the 30th of August, 1854, for the port of Philadelphia. The libellant's eighteen cases by the Shamrock, from Havre, arrived at Liverpool in time to put them on board of the City of Philadelphia, a week before the time that was provided for in the bill of lading, for a different vessel. The respondents accordingly shipped sixteen of them by the City of Philadelphia; the other two were afterwards shipped by the City of Manchester, on the 6th of September, 1854. The City of Philadelphia sailed on her first voyage, bound to Philadelphia, on the 30th of August, 1854, and on the 6th September struck the point of Cape Race, and was wrecked. Two of the cases on her were entirely lost, and the others much damaged; while the two cases not put on board her, arrived in the City of Manchester in due season, and in order.

The evidence as to the seaworthiness of the ship, and as to the cause of the disaster, was that of the captain, and was as follows: "She was a new ship. I saw her in course of construction. She was built of iron, of the very best description; the character of the workmen stood very high on the Clyde; the naval constructors and workmen were of high character. She was, in every respect, a seaworthy vessel, at the time she started on her voyage. No expense was spared in fitting her up properly. She was well rigged and well manned; she continued seaworthy. She struck the point of Cape Race—up to that time she continued perfectly seaworthy. If she had not struck, at the average rate of our passage, we would have been in Philadelphia in five days more. The steamer was wrecked. We backed off the point of Cape Race, and run her on shore to save the lives of the passengers, and to keep her from sinking. There was no tempest; she struck in a dense fog—and the sinking of the vessel, and the damage done, resulted from her

striking the cape." No other account was given of the cause of the loss; and it was commonly supposed that the iron vessel had caused the needle to deflect; but this was not in proof. The vessel was between thirty and forty miles out of her proper course when she struck.

There was no proof, except as it was given by the bill of lading, that Bazin knew anything about the respective vessels, or that he had preferred one vessel rather than another. His libel, however, alleged that some time previous to the day of shipment, he had by letter directed his agent in France to send his goods by the City of Manchester, to sail from the port of Liverpool on the 6th day of September, 1854, knowing her to be a safe and -reliable steamship, and under skilful management; and that, when in France, he had personally given the same orders, and made all his arrangements accordingly. The answer of the steamship company, stated that "the substantial and exclusive object of the contract, as understood between the parties, and as appears upon the face of the bill of lading, and as understood by the usages of trade, was to transport the eighteen cases of merchandise named therein, to Philadelphia, in the United States, in the shortest time, and in the earliest steamer, after the merchandise arrived from Havre." "The particular steamship," they answered, "which was to sail on the 6th of September, being named in the said bill of lading, was so named, inasmuch as the parties to the contract had reason to believe, from the usual facts which were incident to forwarding goods from Havre to Liverpool, that the first steamer to sail after the arrival of the merchandise would be the City of Manchester." They alleged, "that had the City of Manchester, which was advertised to sail on the 6th of September, been for any cause unable to proceed upon her voyage, they would, either by some other vessel to sail on that day, or by the first vessel sailing after that day, have shipped the said cases direct to Philadelphia. But that the cases arriving from Havre in time for shipment by the City of Philadelphia, which sailed on the 30th of August; the respondents, in the diligent and faithful discharge of duty, desiring that the libellant should receive his goods in the shortest possible time, and in compliance with the customary mode of the particular business of the respondents, and settled usage of trade in this respect, shipped sixteen of said cases, safely and in good order, upon the City of Philadelphia, rather than permit the same to lose an entire week by remaining on deposit in Liverpool, for the sailing of the vessel appointed for the 6th of September."

A witness was examined by the respondents, in order to confirm this view, and to prove a custom varying the obligation to comply with the terms of the bill of lading, and to show, that in forwarding the goods

more expeditiously than they would have done by complying with those terms, they had acted in a usual and legal way, and one always desired by shippers. His testimony was thus: "According to the best of my knowledge and belief, there does exist at Liverpool, a general usage, custom and practice, amongst forwarding companies, as respects the time, order and manner of the shipment of goods sent to them, to be carried to the United States of America. Such general usage, custom and practice is, that the goods so sent for shipment, should be shipped to their place of destination with all dispatch, and, if possible, by the first vessel of the company then next sailing, in order to get the goods into the foreign market with every expedition, for the benefit and advantage of the shippers or consignees; I believe the British and North American Royal Mail Steam Packet Company, commonly called the Cunard Company, recognize and adopt this custom and usage, and I am not aware of there being any other British steam shipping company, having steamers for business purposes, between Liverpool and the United States of America. I am not aware of any other general rule, order, practice, usage or custom, other than what I have deposed to, which has existed ever since I have been in the employment of the company, about three years; it is not a secret practice, usage or custom, but, so far as I know, it is generally known to the shippers by the said steamship company's vessels. I first became aware of the fact that such custom existed at the time when I took charge of that department in the office of the company, which enabled me to have a knowledge of such custom by my intercourse with parties conducting business. I cannot state when this custom first arose, although I believe it has been of long standing, nor can I state, except as I have already done, amongst whom it prevails, nor whether it is subject to any, or what exceptions. I believe, and I have no doubt it is the fact, that shippers do frequently designate particular ships or vessels to carry their goods, but I say that I do not know, and I do not believe, that there is amongst shippers a preference sometimes for particular ships of the same line, or the masters commanding the same, and I have not known instances in which shippers have delayed sending goods by a particular ship when there was full opportunity to do so, in order that they might go or be shipped by some other vessel sailing at a subsequent time, which they, for any reasons, preferred, except in such instances where several ships belonging to different parties are destined for the same port, to sail about the same time, and in those instances, I believe, a preference is given to a ship of the first class, in preference to a ship of a minor class, although the ship of the first class should be advertised to sail some days after the ship of the minor class; but in the case of this company, all their vessels are of the first class, and are all commanded by masters of reputed skill and experience, and no preference is made by shippers as to whether their goods are to be shipped by the one vessel or by the other, and in all instances, as far as I know and believe, the shippers expect and rely upon their goods being shipped by the first vessel, regardless of her name or of the name of her master."

Upon this case, the district court decreed pro forma, in favor of the libellant, Bazin, for the original cost of the goods, adding expenses and cost of transportation, with seventy-five per cent., that being proved to be a fair sum or rate for "anticipated business profits."

David Webster and H. M. Phillips for the libellant, now made the following points:

1. That the bill of lading formed an absolute contract to ship libellant's goods by the City of Manchester, sailing on the 6th of September, 1854; and that any shipment of them by the respondents prior to that time, was at their own risk, and in violation of the contract.

2. That no usage prevailing at Liverpool could vary an express contract, more especially one made at Havre, where no knowledge of such usage was shown to exist.

3. That assuming that the respondents had the right to ship by the City of Philadelphia, they were nevertheless liable, since they had failed to show that she was lost through any of the perils excepted in the bill of lading.

4. That the measure of the libellant's damages was the market value of goods here, at the time they should have been delivered, in estimating which there was to be added to the original cost, not only duties and charges, but an allowance for the advance in value which they acquired in the market, the moment they were in condition to be sold, whether called profits, or by any other name.

On the part of the respondents, James Murray Rush contended:

1. That the receipt for the goods given in Havre, was not a maritime contract, but only an engagement preliminary to a maritime contract, and therefore not within the admiralty jurisdiction of the district court.

2. That the respondents were not bound to detain the goods in Liverpool to await the sailing of the City of Manchester, but under the law, as well as from usage, it was their right, as well as duty, to send them forward by the City of Philadelphia.

3. That anticipated profits could not be recovered, but only market value, or the amount it would take to replace the goods.

GRIER, Circuit Justice. The objection of the respondent's counsel, that the contract is not a maritime contract, cannot be supported. The case presents a bill of lading by which defendants bind themselves to carry goods received at Havre, and deliver

them in Philadelphia. It is a contract for a maritime service, and it would be difficult to say what is a maritime contract if it be not one. If it had been merely an agreement by respondents with libellant, that if he would send goods by their line, they would receive and forward them for a certain consideration, and the breach of the agreement was in refusing to receive or transport the libellant's goods at all, or for the consideration stipulated, then this first objection of the respondents would apply. But when the respondents have received the goods on board their vessel, and given a bill of lading to transport them across the ocean, it can hardly be called a preliminary agreement to a maritime contract, and not the contract itself.

The case then presents these two questions on the merits:

1st. Are respondents liable?

2d. If so, what is the rule of damages, and how is their amount to be ascertained?

The reason given by the answer why the City of Manchester was named in the contract, may possibly have been the true one, or that assigned by the libel, to wit, that the libellant "directed his agent in France to send his goods by the City of Manchester," which was advertised to sail on the 6th of September, because he knew her to be a safe and reliable vessel, and under skilful management. But we need not search for any reason, "Stet pro ratione voluntas." The libellant may, in fact, have had no better reason than that he believed the City of Manchester to be a lucky vessel, or he may very justly have preferred a tried boat and crew to a new iron steamer, whose officer or whose compass had not been tested by a trip across the ocean. Reason or no reason, he had a right to have his contract fulfilled according to its stipulations, and the result has shown that if such had been the case, his goods would have arrived safely. If the goods had been sent by the Manchester, the risks accepted in the bill of lading would have been borne by the libellant. For them he was his own insurer, and the carrier of those not accepted. If the carrier changes the vessel and the time of dispatching the goods, he has substituted different risks from those stipulated by the parties, and should be held as insurer against, all loss from whatsoever cause. The loss to libellant is a result of defendant's breach of contract.

But, assuming that the libellant had no good reason for desiring his goods to be sent by a particular vessel, and that the insertion of the name of the City of Manchester was merely pro forma, to fill up the usual blanks in a printed bill of lading, is there any evidence whatever that the goods were not injured in consequence of any accident accepted in the bill of lading?

The respondents aver that the ship was seaworthy in every way; the libellant denies the fact in his replication. The testimony of the captain shows his steamboat to have been new, made of iron, tight and stanch, well rigged and manned. The only account given of the loss of the vessel, was as follows: "She struck the point of Cape Race; up to that time she continued perfectly seaworthy. If she had not struck, at the average of our rate, we should have been in Philadelphia in five days. The steamer was wrecked. We backed off the point of Cape Race and run her on shore to save the lives of the passengers, and to keep her from sinking. There was no tempest. She struck in a dense fog; the sinking of the vessel and the damage done, resulted from her striking the cape."

Here, then, we have no other reason given by the captain, nor any testimony whatever, as to how or why this great mistake of running against a cape occurred. The answer and the witness both seem to assume that running against a cape or a continent is one of the usual accidents and unavoidable dangers of the sea. That cannot be termed an "accident of the sea" within the exceptions of the bill of lading, which proper foresight and skill in the commanding officer might have avoided. If the compass on the new iron vessel was not sufficiently protected to traverse correctly, the vessel was as little seaworthy as if she had no compass—and this should have been carefully ascertained before she started on her voyage. If there was no fault in the compass, then it is very evident that the officer who is thirty or forty miles wrong in his calculation, and driving through a thick fog with a full head of steam, and first discovers his true position by running on an island, a cape, or a continent, has neither the skill nor the prudence to be entrusted with such a command—and for want of such an officer the vessel is not seaworthy.

The loss of the goods committed to a carrier, and in possession of his servants, puts the burthen of proof on him, to show how it took place, and that it was not by their fault, but in consequence of some of the unavoidable accidents excepted in the bill of lading.

The respondents have not alleged or proved any one fact tending to relieve them from responsibility. That a steamboat has been either ignorantly, carelessly or recklessly dashed against a cape in a thick fog, cannot be received as a plea to discharge the carrier. Yet for anything that appears such is the case before us. If there were any circumstances tending to lead to a contrary conclusion, they are not in evidence in the case.

II. The rule of damages in these cases is, that the carrier shall pay for goods not delivered, their net value at the port of delivery. He is not liable for any speculation or possible profits which the owner might have anticipated in his peculiar business. Thus, suppose the carrier liable for non-delivery of a hundred barrels of flour at Philadelphia on a given day, and on that

day flour is worth five dollars a barrel, the amount of the owner's damage is clearly just $500, because he could have bought a hundred barrels of flour and supplied his loss for $500. The owner cannot be allowed to show that he was a baker and could in a few weeks have cleared ten dollars a barrel by manufacturing his flour into bread. The sum of money which represented the net value of the lost articles, with interest till paid, is all that can be recovered from the carrier when goods have been lost in the course of transportation. And as the owner would have paid freight as a deduction from the net value of his flour, so when the carrier pays its value, he will be entitled to have his freight deducted, if it has not been paid.

In all cases when the article to be delivered has a definite market value, the application of the rule is without any difficulty.

The libellant keeps a variety store in Philadelphia. The eighteen cases contained a selection of ten thousand articles of perfumery, &c., &c., to be found only in such shops. They are retailed generally at one hundred per cent. profit on the original cost in Paris. But few if any of these numerous trifles have any known wholesale or market value in Philadelphia, nor could libellant have supplied himself with the lost goods most probably in the Philadelphia market at any reasonable price. How, then, are we to arrive at a rule of damages to ascertain the amount of loss to libellant for the non-delivery of his articles? Certainly not as contended by his counsel, by taking the original cost, adding expenses and charges of transportation, and seventy-five per cent. "for loss of anticipated profits."

If these articles, like most other goods and wares, had a known value in market here, for which they could be purchased, the original cost and charges of transportation would have nothing to do with the calculation. But as such is not the case in the present instance, we must inquire what was the original cost and what the charges of transportation, &c., in order to arrive at their value here; or more properly, what would it cost to get other goods of precisely the same value in place of those lost. Now, we may assume (as nothing is pretended to the contrary) that a bill for the very same sort of articles which Bazin has purchased could be filled in Paris for the same sum of money. In less than sixty days, every article not delivered here by the carrier, could be put in Bazin's shop, for the same price which he has paid for them. But he will have lost only the interest of his money for sixty days longer. How much profit he might have made by retailing them, or what the amount of "anticipated business profits," being matters not capable of certain ascertainment, cannot make a part of the consideration. Legal interest is all that the law knows as the damage for detention of money. As the goods lost, therefore, have no market value

here, and could not be purchased in our market, their value must be ascertained by adding costs and charges, and sixty days' interest on this sum. From this amount deduct freight, which is unpaid, and add interest on the balance till judgment.

If counsel can agree upon the amount of damages calculated on these principles, the decree will be entered for such amount; if not, the case will be referred to a master to report.