FLINT & P. M. R. CO. v. MARINE INS. CO., Limited.

(Circuit Court, E. D. Michigan. October 7, 1895.)

1. RULES OF NAVIGATION—SPEED IN FOG.
The word "fog," as used in Rev. St. § 4233, providing that "every steam vessel shall, when in a fog, go at a moderate speed" applies to all atmospheric conditions increasing the perils of navigation, such as mist or falling snow.

2. MARINE INSURANCE—NEGLIGENT NAVIGATION.
A steamer, while running at her ordinary speed of 10 miles per hour, in heavy snow squalls, in the general direction of the land, which her officers had reason to believe was close aboard on the port side, it being dark, with a heavy sea, and the wind following her, ran aground, and remained fast. · She had shortly before starboarded her helm so as to swing 13 points, the soundings having shown that she was too close in shore. *Held*, that the stranding of the steamer was the result of her excessive speed, so as to prevent recovery on a marine insurance policy excepting losses caused by want of ordinary skill and care in navigation.

3. SAME—UNSEAWORTHINESS.
The improper starboarding of the wheel and excessive speed of the steamer were not excusable on the ground that her rudder stock had been so twisted on a previous trip that the rudder could not be thrown hard over under a hard a-port wheel, and that her speed aided her in swinging around, in view of the fact that the speed was necessitated by the defective condition of the rudder, and that this was within an exception in the policy of risks arising from the unseaworthiness of the vessel.

4. RULES OF SUPERVISING INSPECTORS—LOOKOUT ON VESSEL.
The rule of the supervising inspectors that all passenger and freight steamers shall have one of the crew on watch in or near the pilot house is authorized by Rev. St. § 4405, requiring the inspectors to establish rules necessary to carry out the statutory provisions as to steam vessels, among which is one that the vessel shall carry "a full crew, sufficient at all times to manage the vessel."

5. SAME.
Apart from any statutory regulation, there is a want of ordinary care and skill in navigation, within the meaning of an exception in an insurance policy, if the vessel fails to have a lookout properly stationed.

6. SAME.
The failure to have a lookout cannot be excused on the ground that the darkness was so great and the storm so severe that he could not have been of any use.

7. NEW TRIAL—NEWLY-DISCOVERED EVIDENCE.
A new trial will not be granted for newly-discovered testimony which is cumulative, was easily obtainable at the first trial, and is manifestly insufficient to change the result.

8. SAME—SURPRISE.
One cannot obtain a new trial on the ground that he was surprised by certain evidence, unless he applied for a postponement or continuance.

9. SAME.
The failure of plaintiff, if dissatisfied with the evidence, to take a nonsuit, with leave to move to set it aside, or to apply for permission to withdraw a juror, in cases in which this is permissible, is ground for refusing his application for a new trial on the ground of surprise.

This is an action of assumpsit, brought upon the policy of marine insurance issued by the defendant, August 1, 1892, upon the propeller "Flint and Pere Marquette, No. 2," styled in the pleadings

and evidence in the case "F. & P. M. No. 2." The policy ran from noon of August 1, 1892, to noon of December 5, 1892, and insured the plaintiff in the sum of $15,000. The risks covered by the policy are thus defined in that instrument:

"Touching the adventures and perils which the said insurance company is content to bear and take upon itself by this policy, they are of the lakes, rivers, canals, jettisons, that shall come to the damage of the said vessel or any part thereof; excepting all perils, losses, misfortunes, or expenses consequent upon, and arising from, or caused by, the following or other legally excluded causes, viz.: Damage that may be done by the vessel hereby insured to any other vessel or property; incompetency of the master, or insufficiency of the crew, or want of ordinary care and skill in navigating said vessel, or in loading, stowing, or securing the cargo of said vessel; rottenness, inherent defects, overloading, and all other unseaworthiness, theft, barratry, or robbery; charges, damage, or loss in consequence of the seizure or detention by reason of any proceedings at law, in equity or in admiralty, or by reason of any illicit or prohibited trade or any trade in articles contraband of war; the violation of any law, ordinance, or regulation to which the said vessel may be subject. * * *"

The other provisions of the policy are such as are found in the usual form of lake hull policy, and are not material here.

The insured steamer, laden with a cargo of flour, bran, feed, and shorts, was, when stranded, on a voyage from Duluth, Minn., to Ogdensburg, N. Y. Having stopped at Amherstberg for fuel, she left that place at 12:20 p. m. of the 18th of November, 1892, the wind being then W. S. W., blowing hard, and continued so. About 12 a. m. of the 19th of November, she met with light snow, which continued until about 3 o'clock a. m., when, as the protest states—

"It snowed so hard we could not see more than the length of the boat. At this time we were steering E. N. E. At 3:55 o'clock we checked the vessel down so she was making from four to five miles per hour, and ran at that speed for one hour and forty minutes, when it cleared up somewhat, and we thought we saw the land, and hauled her out a point. The second mate commenced to throw the lead, and, finding no bottom. ordered her back on her course again, but continued to throw the lead. It shut in thick again, and the man at the lead sang out, '8 fathoms!' We were still under check, and the master ordered the wheel hard a-starboard, and signaled the engineer to give her full speed; and, when the vessel headed N. by W., she stranded on the beach about six miles northwest of Long Point light, in Lake Erie. We made every possible effort with the vessel's own power to release her, and failed. In this condition, the vessel pounded hard, and commenced leaking."

The protest further recites the efforts made to release the steamer, and that her deck cargo and a large part of that in the hull were necessarily jettisoned before she could be floated.

The defendant pleaded the general issue, which, under the practice of Michigan, in actions at common law, puts in issue every fact which it is necessary for the plaintiff to establish upon the trial. Both parties expressing their readiness to proceed with a trial, a jury was impaneled, and the plaintiff submitted its evidence in support of its claim upon the policy. Some evidence was adduced by the defendant condemning the navigation of the vessel just preceding the stranding, and also to the effect that, by reason of the condition of her rudder, the steamer was unseaworthy. It appeared in the evidence of the plaintiff that, a few minutes before the strand-

ing, the master of the vessel, thinking that he saw land about a point or a point and a half on the port bow, changed the steamer's course to a point to the southward, but, learning from the soundings which were made by the second mate that he could get no bottom, concluded he was mistaken, and hauled her back to her course. The lead was again cast, and eight fathoms found; and this indicating to the master, as he says, that he was too close in shore, and noting a change in the appearance of the water, the steamer's wheel was put hard a-starboard, and the engine rung up to full speed, until, when heading about N. by W., on her swing, the steamer struck the beach. The master was asked whether it was snowing at the time he put his helm hard a-starboard. He replied: "Well, it was snowing in squalls, and then it would clear up, and snow again. I cannot say it was snowing at that instant. I didn't see land when I struck the beach." The steamer stranded in ten feet of water. Her draft was twelve feet. The distance from the point where the soundings found eight fathoms to the place of stranding the master thought to be about a mile and a half, and the wheel was starboarded, he says, because he knew he "had no business in eight fathoms of water." He also stated that the coast line at the place of stranding is about E. and W.; that to have cleared the land by porting required him to head about E. by S., his regular course being E. N. E.; and that, if he had ported and swung 3 points, he would have cleared the land, if he did not fetch up; and that, in order to clear the land under her starboard wheel, he would have to swing 13 points. The wheel was starboarded instead of ported, to clear the land on the vessel's port side, because of the condition of the vessel's rudder stock, which the mate states "was twisted up in the Portage river some two trips before that, and we had it partly straightened out at Hancock or Houghton, and, when we got to Buffalo, we had a kind of a kink put in the tiller,—that is, instead of straightening the rudder, we crooked the tiller, and they didn't get that entirely straight; and for that reason, when we put the wheel a-starboard, she would go around a great deal quicker than she would by putting it a-port. We could put the tiller over, but the rudder would not get as far over as it would by going starboard. There was quite a little difference in her swing."

It further appeared by the plaintiff's own witnesses that at the time of the stranding, and for some time prior thereto, the only persons upon the deck forward engaged in the navigation of the vessel were the master, the second mate, and the wheelsman, who was at his post at the wheel; that the second mate was engaged in heaving the lead up to about the time of the stranding or until the order "Hard a-starboard!" was given, under which the vessel was running when she struck. There was no person forward on duty as lookout. From about 3 o'clock a. m. to the time of the stranding, it had been snowing very hard, at times lighting up, and again coming in squalls so thickly that it was impossible at times to see more than the length of the steamer. The steamer struck about 6 o'clock a. m. while running at full speed under her hard a-starboard wheel,

as stated, and when she had swung only about 3 points of the 13 which were necessary to take her clear of the land.

At the conclusion of the testimony, on the motion of defendant's counsel, the court directed a verdict for the defendant, on the ground that, under the evidence in the case, the stranding of the steamer and the damage consequent thereon were caused by perils excepted from the policy.

Geo. Clinton and Brennan, Donelly & Vandermark, for plaintiff.

F. H. Canfield and H. D. Goulder, for defendant.

SWAN, District Judge. Three grounds are assigned in plaintiff's motion for a new trial: (1) Because the court directed a verdict for the defendant; (2) because of newly-discovered evidence; (3) that the plaintiff was taken by surprise.

In considering this motion, it is to be borne in mind that it is an appeal to the discretion of the court, and not merely to its power, and the real question for determination is whether the party applying for a new trial has been wronged by the misdirection of the court in matter of law, or, without fault or laches on his part, has been disabled from fully presenting his case, and injustice would be done if the verdict were allowed to stand. The first inquiry, therefore, is whether upon this record, which comprises all the evidence in the cause, the direction by the court of a verdict for the defendant was erroneous.

In Railroad Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, which is a late expression of the power of the court to direct a verdict, it is said:

"It is well settled that a court may withdraw a case from them [the jury] altogether, and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it."

This is but one of many explicit declarations of a doctrine which has obtained in that court certainly as early as the case of Parks v. Ross, 11 How. 362.

It is still more pointedly stated in North Pennsylvania R. Co. v. Commercial Nat. Bank of Chicago, 123 U. S. 727–733, 8 Sup. Ct. 266, where it is said:

"It would be an idle proceeding to submit the evidence to the jury when they could justly find only in one way."

The reasons for the instruction in defendant's favor in the case at bar were founded upon the undisputed facts (1) that the steamer, at and prior to the stranding, was running in a thick blinding snow-storm at full speed; (2) that, under those conditions which demanded the highest vigilance and the most circumspect navigation, no look-out was maintained on the steamer; (3) that the stranding of the steamer was also contributed to, in large part, by the defective condition of her rudder, because of which the master put his wheel hard a-starboard, swinging the vessel towards the land, preferring the chances of keeping the vessel off the land while heading for it and

swinging 13 points, to the more natural and prudent maneuver of heading out into the open lake, and bringing the steamer head to the wind under a hard a-port wheel, to effect which she had to swing only 3 points.

Upon the trial, defendant offered in evidence the act of the parliament of the dominion of Canada passed in the forty-third year of Queen Victoria (2d sess. 4th parliament, c. 29, p. 236), entitled "An act to make better provision respecting the navigation of Canadian waters." Section 2, arts. 13, 24, and section 11 of that act provide as follows:

"Art. 13. Every ship, whether a sailing ship or a steam ship shall in a fog, mist or falling snow go at a moderate speed."

"Art. 24. Nothing in these rules shall exonerate any ship or the owner, or master or crew thereof, from the consequences of any neglect to keep a proper lookout or of the neglect of any precaution which may be required by the ordinary practice of seamen or by the special circumstances of the case."

"Sec. 11. Whenever foreign ships are within Canadian waters, the rules for preventing collision prescribed by this act and all provisions of this act relating to such rules or otherwise relating to collisions shall apply to such foreign ships and in any case arising in any court of justice in Canada, concerning matters happening within Canadian waters, foreign ships shall, so far as regards such rules and provisions, be treated as if they were British or Canadian ships."

Article 13 of the Canadian statute is identical with article 13 of the act of congress entitled "An act to adopt the revised international regulations for preventing collisions at sea," approved March 3, 1885.

Article 24 of the Canadian statute is identical with article 24 of the act of 1885. By the first section of the act of 1885, the rules and regulations thereby enacted "shall be followed in the navigation of all public and private vessels of the United States upon the high seas and in all coast waters of the United States, excepting such as are otherwise provided for."

By section 2 of the same act it is provided that:

"All laws and parts of laws inconsistent with the foregoing revised international rules and regulations for the navigation of all public and private vessels of the United States upon the high seas and in all coast waters of the United States are hereby repealed, except as to the navigation of such vessels within the harbors, lakes and inland waters of the United States. * * *"

Whether this statute controlled the navigation of the Great Lakes we need not decide. The reasons for observing upon those waters the precautions it enjoins are as strong as those which led to its adoption for ocean navigation.

By rule 21, c. 5, tit. 48, "Commerce and Navigation," Rev. St. U. S. (section 4233), it is enacted that "every steam vessel shall, when in a fog, go at a moderate speed."

Whether, therefore, the F. & P. M. No. 2, at the time of her stranding, was subject to the Canadian statute, because navigating in waters of the dominion, or whether she was governed by rule 21 of section 4233, Rev. St. U. S., or by articles 13 and 24 of section 1 of the act of March 3, 1885, is immaterial. The better opinion would seem to be that the steamer was under the law of her flag. U. S.

v. Rodgers, 150 U. S. 249, 14 Sup. Ct. 109. The express language of the Canadian and the later American statute, and the evident spirit of rule 21, have all a common purpose; and although the latter does not expressly enjoin moderate speed in a "mist" or "falling snow," but speaks only of a "fog," there can be no doubt that it is as mandatory of moderate speed in "mist" or "falling snow," as the other statutes where these conditions of the atmosphere are expressly mentioned, since all are equally within the reason of rule 21.

As said in Jones v. Indemnity Co., 101 U. S. 626:

"A thing may be within a statute but not within its letter, or within the letter and yet not within the statute. The intent of the lawmaker is the law."

The intent of these navigation acts is obviously the security of life and property, and it is essential to the attainment of that object that the word "fog," in rule 21, should be held a generic term, descriptive of all conditions of the atmosphere increasing the perils of navigation, and that its meaning should not be limited to the strictly technical definition of the word. It is the obscuration, not its particular natural cause, which necessitates moderate speed, and all other precautions.

In Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U. S. 408, 422, 10 Sup. Ct. 934, the court, after citing the Canadian statutes in evidence in that case, which correspond exactly with those involved here, says:

"These statutory rules correspond with those revised by an order of council in England in August, 1879, and prescribed by congress (Rev. St. § 4233; Act March 3, 1885; 23 Stat. 438), and recognized as international rules."

In that case the court held that a Canadian vessel navigating Canadian waters was bound to comply with the laws of Canada, and applied to her positive breach of the statute in maintaining full speed in a dense fog the settled rule in collision cases declared in the case of The Pennsylvania, 19 Wall. 125, and reiterated in Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264, and The Martello, 153 U. S. 64, 74, 14 Sup. Ct. 723, viz.:

"That the vessel must show not only that probably her fault did not contribute to the disaster, but that it could not have done so."

An additional reason for this ruling was the fact that perils occasioned by the want of ordinary care and skill or of unseaworthiness were excepted by the policy. In that case, as in this, the rule of liability was held to attach where the steamer was stranded while thus violating the statute by her excessive speed and other breaches of the municipal law, and the owners of the vessel sought to recover from her insurers for the loss occasioned by stranding, under a policy almost exactly alike in its conditions to that sued upon here. The same reasoning which enforced the Canadian statute in that case, and held the steamer subject to the law of her flag, is equally cogent here. If the F. & P. M. No. 2, because of her stranding in Canadian waters, was subject to the statute of Canada, her breach of those statutes subjects the plaintiff to the burden of proving conclusively that her transgression in no way contributed to the re-

sult. If, on the other hand, the steamer is to be regarded as controlled by the law of her flag while navigating, by right of treaty between this country and Great Britain, the waters of the Great Lakes, whether on one side or the other of the international boundary line, the same rule of evidence requires the plaintiff to show that the breach of the statute, rule 21 of section 4233, or the act of 1885, if the latter controlled lake navigation, could have had no part in producing the disaster. While, as a rule, the cause of the stranding would be a question of fact for the jury, under the statutes enjoining moderate speed, and requiring a lookout, and the interpretation given them by the courts, there arises a preliminary question, purely of law, namely, whether, under the evidence in the cause, the jury would be warranted in finding that neither the speed of the vessel nor the absence of a lookout contributed to the stranding. If, for example, this question of fact had been submitted to the jury, and their verdict had negatived all connection between the violation of the statutes and the stranding of the vessel, would the evidence in the cause sustain this conclusion as beyond doubt? If the evidence had not that probative force, it would manifestly be the duty of the court to withdraw the case from the consideration of the jury, and direct a verdict for the defendant.

There can be but one view of the evidence in this cause. It not only fails to dissociate the forbidden act and its consequences, but it establishes incontestably the relation of cause and effect between the speed and the stranding of the steamer, in that it shows that while running at her ordinary speed of 10 miles per hour in heavy snow squalls, in the general direction of the land, which her officers had reason to believe was close aboard on the port side, in darkness, with a heavy sea and wind following her, she struck hard, and remained fast at the place of grounding, in spite of every possible effort to release her; that when she took her departure from her regular course, starboarded her helm, and headed for the land, in an attempt to clear it by swinging 13 points, the distance from the shore was unknown to her officers, and the change of course itself was prompted and made necessary by the admitted fact that the soundings had demonstrated to the master that he was coming in too close to the shore, and when he admits that he "knew he had no business in 8 fathoms of water." Ordinary care and skill in navigation, independent of the statute, imperatively required, under such conditions, that the vessel's speed should be reduced to the lowest point consistent with the preservation of her steerage way. The Kestrel, 6 Prob. Div. 182. It is sought to justify the starboarding of the wheel and the speed of the steamer by the fact that her rudder stock was so twisted that it was safer to starboard than to port, because the rudder could not be thrown hard over under a hard a-port wheel; that the increase of speed was seaman-like, and justified by the exigency, because it aided the swing of the steamer in her effort to keep off from the land and head into the wind. Granting that the increase of speed was good seamanship in the emergency, the fact remains that the necessity for it was created in part, at least, by the condition of the rudder, which precluded taking

the proper and natural course of heading away from the shore, and getting into deep water, and drove the master to the fatal experiment of running towards the danger to be avoided, and this, too, in a thick blinding snowstorm and the darkness of an early November morning.

It also appears indubitably that no lookout was maintained on the steamer during this time, but that the person who ordinarily performed the duties of that post was engaged in heaving the lead, giving no attention to his proper duties. In extenuation of this, it is argued that the severity of the storm was such as to make it impossible for a lookout to be of any service, and that, had one been at his proper station, he would have been unable to descry the land, and hence no fault can be imputed to the steamer for his absence. There is no precaution the observance of which the courts of this country and of England have more rigorously enforced than the duty of maintaining a vigilant and competent lookout, especially under conditions of weather such as prevailed before and at the time of this stranding. These were such as had notified the master of the vessel of the necessity for the greatest care in the navigation of the vessel. Before he starboarded his wheel, and headed for the shore, he had changed his course a point to the southward, because of the indications that, instead of being five miles away from the land at that point, he was much nearer; how much nearer he did not know. All landmarks were obscured. A succession of snow squalls shut off his view ahead. The weather cleared occasionally, and again thickened. The argument that in these conditions a lookout would have been of no service proves too much, and would logically disprove the necessity of a lookout at any time. The darker the night and the thicker the weather, the greater is the necessity for using every precaution to avert disaster; and the necessity of having a competent person on watch, scrutinizing the vicinity with ceaseless watchfulness in search of danger, has been recognized long anterior to the enactment of the statutes of England and America, which, by necessary implication, assume that a lookout is one of the "ordinary precautions" to insure safe navigation.

In Mars. Mar. Coll. p. 339, it is said:

"Many years before the rule of the road at sea was regulated by act of parliament, the practice of seamen had established rules to enable approaching ships to keep clear of each other. These rules, which are the foundation of those now in force, were well established by custom, and formed part of the general maritime law administered by the admiralty courts."

At page 496 it is said:

"The law as to what is proper care and skill as to navigation, and which are proper precautions required by the ordinary practice of seamen, is illustrated by numerous decisions: First, as to lookout: If a ship is proved to have been negligent in not keeping a proper lookout, she will be answerable for all the reasonable consequences of her negligence. * * * The lookout must be vigilant and sufficient, according to the exigencies of the case. The denser the fog and the worse the weather, the greater the cause for vigilance. A ship cannot be heard to say that a lookout was of no use, because the weather was so thick that another ship could not have been seen until actually in collision."

This text is, in substance, the opinion of Dr. Lushington in The Mellona, 3 W. Rob. Adm. 7, 13.

See, also, The City of Washington, 92 U. S. 31.

The case of The Ann (decided in 1691) Mars. Adm. Cas. 263, held the necessity of a lookout long before there was any legislation requiring that precaution.

In The Farragut, 10 Wall. 334, Mr. Justice Bradley says:

"It is undoubtedly true that the absence of a special lookout would in many cases, perhaps in most cases, be regarded as evidence of great negligence."

He quotes the provisions of the act of congress of April 29, 1864, which declares that "nothing in the rules shall exonerate any ship or the owner or master or crew thereof from the consequences of * * * any neglect to keep a proper lookout," etc., and adds: "Thus intimating that a proper lookout is one of the ordinary precautions which a careful navigation involves." This was the view of the court in the case of Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U. S. 408, 10 Sup. Ct. 934, where the case of The Farragut is approved.

Decided cases go still further in enforcing compliance with the legal duty to take all the precautions for the safety of life and property which the ordinary practice of seamen requires.

In the case of The Colorado, 91 U. S. 692, 698, it appeared that, while running in a fog at night on Lake Huron, the propeller Colorado came into collision with and sunk a sailing vessel. The court says:

"Enough appears to show conclusively that there was but one lookout, and no other seaman to assist the wheelsman in any emergency which might arise, though the master, as well as the mate, was fully apprised that the fog was unusually dense, and both knew full well that the course of the propeller was in the much frequented pathway of commerce. Such a watch, consisting only of the mate, one wheelsman, and one lookout, could hardly be deemed sufficient for such a large propeller, even in a clear night; and, if not, it certainly cannot be regarded as one equal to the emergencies likely to arise in a dark night, when the fog was as dense as it was on the night of the collision. Ocean steamers, as remarked by this court on a former occasion, usually have, in addition to the officer on the deck, two lookouts, who are generally stationed, one on the port and one on the starboard side of the vessel, as far forward as possible. During the time they are charged with that service, they have no other duties to perform; and no reason is presented why any less precaution should be taken by first-class steamers on the lakes. Their speed is quite as great, and the navigation is no less exposed to the danger arising from the prevalence of mist and fog, or from the ordinary darkness of the night; and the owners of vessels navigating on those waters are under the same obligations to provide for the safety and security of life and property as attach to those who are engaged in navigating the seas. Chamberlain v. Ward, 21 How. 571."

This case emphasizes, also, the necessity of having the lookout properly stationed and vigilant in the performance of his duty.

It is idle to multiply citations to show the importance which the courts have uniformly attached to this requirement, both for the prevention of collision with other vessels, and to notify the proximity of the land and all dangers of navigation. It is, as has been said, also recognized in the statute of March 3, 1885, above quoted.

By paragraph 8 of rule 5 in Supervisors' Rules and Regulations, it is provided that:

"All passenger and freight steamers shall, in addition to the regular pilot on watch, have one of the crew also on watch in or near the pilot house, and this rule applies to all steamers navigating in the nighttime."

It is said that there is no authority in the statute for the adoption of such a rule, except section 4463, Rev. St., which provides that no steamer carrying passengers shall depart from any port unless she shall have in her service a full complement of licensed officers and full crew, sufficient at all times to manage the vessel, including the proper number of watchmen. This, it is said, is not a requirement for the maintenance of lookouts. By section 4405, Rev. St. U. S., the board of supervising inspectors are required to "establish all necessary regulations required to carry out in the most effective manner the provisions of this title [Regulation of Steam Vessels], and such regulations, when approved by the secretary of the treasury, shall have the force of law." Whether the word "watchmen," in section 4463, supra, and in section 4477, Rev. St., should be interpreted as requiring the maintenance of lookouts for external dangers, or as referring merely to employés whose duties are limited to the care of the decks and cabins, it is not necessary to decide. The duty imposed by section 4463 of carrying "a full crew, sufficient at all times to manage the vessel," is a provision of title 52, for which, by section 4405, the supervising inspectors may establish regulations, and their regulations, when approved by the secretary of the treasury, "have the force of law." The statute does not prescribe the number of the crew, or designate the duties or station of each member, otherwise than by the requirement "a full crew, and sufficient at all times to manage the vessel"; that is, to insure her safe navigation. This means both that the crew shall be sufficient in number and also of competent skill and experience to perform their duty intelligently, under all circumstances and in all emergencies. The Washington, 3 Blatchf. 276, Fed. Cas. No. 17,220; Pars. Mar. Ins. p. 374. This is declaratory and in affirmance of the ancient law of the sea. Emerig. Ins. 300; Roc. Nav. note 62. The "ordinary practice of seamen" and careful navigation have from time immemorial exacted a competent lookout as a safeguard against collisions and other dangers of navigation, and this requirement of usage and experience may be termed a part of the common law of the sea. In every well-ordered ship each member of the crew must have his post and duties. A regulation which designates the station of so important a member of the watch as the lookout, and requires one of the crew to be assigned to that duty, is calculated "to carry out in the most effective manner" the provisions of section 4463; and for that reason paragraph 8 of rule 5 in Supervising Inspectors' Rules and Regulations harmonizes with the general object of the statute, and is authorized by Rev. St. § 4405.

Independent, however, of the express terms of the law, and the rules and their necessary implications, evinced in the various statutory provisions cited, the obligation to maintain this indispensable precaution against maritime perils is so strongly entrenched in the

usage and experience of navigators that it is well said upon the argument that, "if every statute in which the word 'lookout' appears should be repealed, the legal duty to maintain a lookout would still exist."

This is the ground on which the case of The Ariadne, 13 Wall. 475–479, was decided.  The court says:

"The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of his vessel and the lives of all on board. * * * In the performance of this duty the law requires indefatigable care and sleepless vigilance. The rigor of the requirement rises according to the power and speed of the vessel in question. * * * It is the duty of all courts charged with the administration of this branch of our jurisprudence to give it the fullest effect whenever the circumstances are such as to call for its application. Every doubt as to the performance of the duty and the effect of nonperformance should be resolved against the vessel sought to be inculpated, until she vindicates herself by testimony conclusive to the contrary."

It is safe to say that nearly every decision which has condemned a vessel for the want of a lookout is rested on the inherent recklessness of such navigation and its agency, as the sole or a concurring cause of the disaster, and not upon the transgression of the statute or of the regulations it authorizes, and the rule applies as well to stranding as collision.   Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 26 Fed. 596, 602;  The Kestrel, 6 Prob. Div. 182.

The rule applied to the evidence in this cause in directing the verdict for defendant was the inevitable corollary from the evidence whether the navigation of the vessel and the sufficiency of her crew be judged from the standpoint of the navigation laws, the rule of the supervising inspectors, or of the practice of seamen and the unwritten maritime code.   The contract of insurance equally excludes recovery.   The policy sued upon is not, to use Malloy's quaint phrase, "an insurance against heaven and earth," but excepts, inter alia, from the usual risks, "all losses," etc., "consequent upon, or arising from, or caused by, incompetency of the master, or insufficiency of the crew, want of ordinary care and skill in navigation, inherent defects, * * * and all other unseaworthiness, * * * and the violation of any law, ordinance, or regulation to which the vessel may be subject."   In the view we take of the evidence, it is scarcely too much to say that each and all of the excepted perils were factors in causing the disaster.   The unexplained divergence of five miles from the proper course which led that distance from the place of stranding, the defective condition of the rudder, the immoderate speed of the steamer when in known and in constantly increasing proximity to the shore, and the failure to provide a sufficient watch for the supreme peril of her course and surroundings, remove all doubt as to the cause of the disaster, and exempt the insurer under this contract from its consequences.   As in Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U. S. 408, 426, 10 Sup. Ct. 934, so here, "the exceptions in this policy protect the insurer against the excepted perils as a shipper is protected under a bill of lading from

loss to which the negligence of the carrier has contributed." It may be styled a "maritime accident policy," undertaking only against purely fortuitous casualties. Bazin v. Steamship Co., 3 Wall. Jr. 229, Fed. Cas. No. 1,152.

2. Ought a new trial to be granted on the ground of newly-discovered evidence? "By newly-discovered evidence is meant proof of some material fact in the case which has come to light since the verdict." Grah. & W. New Trials, 1016. Such evidence must not be merely cumulative in its nature, and it must have been unknown to the party at the time of the trial. It must also be of such a character that, if it had been produced upon the trial, it would have changed the result. It must also be shown why the facts sought to be proved were not ascertained at the time of the former trial. The Iron Chief, 11 C. C. A. 196, 63 Fed. 294; Pittsburgh Reduction Co. v. Cowles Electric Smelting & Aluminum Co., 64 Fed. 125; Baker v. Whiting, 1 Story, 218, Fed. Cas. No. 786; Page v. Telegraph Co., 2 Fed. 330; Chandler v. Thompson, 30 Fed. 44; Alsop v. Insurance Co., 1 Sumn. 457, Fed. Cas. No. 262; Wiggin v. Coffin, 3 Story, 1, Fed. Cas. No. 17,624. The evidence outlined in the affidavits filed in support of this ground of the motion is cumulative. No sufficient reason is given why the witnesses were not produced at the trial, and, from the positions held by many of the affiants on the "F. & P. M. No. 2," the matters stated in their affidavits should have been known to the officers of the plaintiff if they had used proper diligence in learning the facts of the loss. Some of the affiants testified on the trial. Several of them will testify that the density of the snow-fall was such that a lookout would have been of no benefit, and that the steamer would swing with equal facility under either wheel. If these things were true,—the testimony of the master, mate, and wheelsman to the condition of the rudder, to the contrary, notwithstanding,—they leave unexcused and unexcusable the master's fatal blunder in driving this heavily laden steamer at full speed in the direction of the near shore, until he had ascertained and fixed her position beyond doubt or deliverance, "by running down a cape or a continent," to use the forceful language of Justice Grier in Bazin v. Steamship Co., 3 Wall. Jr. 229, Fed. Cas. No. 1,152.

The affidavits of some of the crew of the steamer Newburgh, which stranded a short time after the F. & P. M. No. 2, and about five miles to westward of the latter, when on the same general course, are offered to show that a lookout could not have seen land after 5 o'clock that morning, so heavy and constant was the snowfall. This only proves that the Newburgh encountered worse weather in that locality than the F. & P. M. No. 2 had met at the same place, according to the latter's crew, who agree that the snow came in squalls, and that there were intervals of clearer weather. The master of the Newburgh unqualifiedly condemns as "reckless navigation and bad seamanship" the starboarding of the steamer when eight fathoms were reported by the leadsman,

and the running of the vessel thereafter at full speed. He further states that "we were not keeping any lookout for land. We did not suppose we were anywhere near land." In another affidavit he states that a lookout was stationed forward. The fireman, who at intervals observed the weather, is confident that the land could not have been seen, so heavy was the storm when the Newburgh struck; but his opinion is of little value, as he was on watch in the fire hold from midnight until 6 o'clock a. m. of the morning of the stranding. A careful examination of all these affidavits is convincing that the proposed testimony is cumulative, was easily obtainable at the first trial, and is manifestly insufficient to change the result. No court has ever extended to a defeated litigant such a degree of indulgence as that asked by this motion, upon a state of facts like those in issue here.

3. The claim that the plaintiff was taken by surprise, and was unable to meet or explain the questions raised by the court and counsel on the effect of the absence of a lookout, and as to the seaworthiness of the vessel by reason of the alleged defect in the rudder, merits no favor. The plaintiff had urged the trial of the cause, and announced its readiness to proceed. This ground of the motion is fully answered by Judge Story in Ames v. Howard, 1 Sumn. 482, Fed. Cas. No. 326, where, as here, "no application was made to the court for a postponement or continuance for the purpose of a more full and thorough examination of the point or to search for further testimony. * * * If the party interested makes no such application, but elects to go on with the cause, relying upon his other strength to sustain his claim, he is understood to waive the matter of surprise; and he cannot be permitted to take his chances with the jury, and, if unsuccessful, then to move the matter as ground for a new trial. The purposes of justice would be defeated, and not advanced, by any different course." Judge Curtis in Carr v. Gale, 1 Curt. 384, Fed. Cas. No. 2,433, expresses the same view with equal emphasis. In the case at bar, the plaintiff, if not satisfied with the evidence, might also have elected to take a nonsuit, with leave to move to set it aside, or it could have applied for permission to withdraw a juror. The failure to make either application, and the election to rest the case on the evidence submitted, is an additional, and in itself a decisive, consideration against this ground of the motion.

The motion for a new trial in these causes is denied, and judgment will be entered on the verdict.