## CHICAGO S. S. LINES, Inc., et al. v. UNITED STATES LLOYDS, Inc., et al.

(District Court, N. D. Illinois, E. D. November 28, 1924.)

No. 34728.

**I. Insurance** ⟨⟩≈470—**Mere raising of vessel held not acceptance of abandonment to underwriters.**

Mere raising of vessel which had sunk alongside dock by salvor employed by underwriters' surveyor *held* not an acceptance of an abandonment of the vessel to the underwriters.

**2. Insurance ☞470—Underwriters having raised vessel to minimize loss held not obliged to make repairs before tendering her back.**

Underwriters, having raised vessel to minimize loss, *held* not obliged to make repairs before tendering her back.

**3. Insurance ☞470—Acts of president of owner corporation held waiver of attempted abandonment of vessel to underwriters.**

Acts of president of owner corporation, after attempted abandonment of vessel to underwriters, in continuing in possession, making temporary repairs, soliciting cargo and insurance, requesting a survey for "class," attempting sale of part interest, and appearing in foreclosure suit by mortgagee, *held* waiver of attempted abandonment.

**4. Insurance ☞470—It is duty of insured, owner of vessel, on its sinking, to make adequate investigation of cause and cost of raising and repairing before abandonment to underwriters.**

It is duty of insured, owner of vessel, on its sinking, to make prompt and adequate investigation to determine the cause and possibility and cost of raising and repairing; and to warrant abandonment it must appear that the vessel sank by reason of peril insured against, and that the cost of raising and repairing would in high probability exceed the stipulated amount.

**5. Insurance ☞470—Whether loss is in an amount warranting abandonment of vessel to underwriters not peculiarly question of fact; "high probability" rule being applicable.**

Whether loss of vessel is in an amount warranting abandonment to underwriters is not purely a question of fact, the "high probability" rule being applicable.

**6. Insurance ☞665(4)—Evidence held insufficient to warrant owner of sunken vessel in abandoning her to underwriters.**

Evidence *held* insufficient to warrant owner of sunken vessel in abandoning her to underwriters.

**7. Insurance ☞416—Underwriters held not liable for damages from sinking of vessel due at least in part to owner's negligence.**

Where sinking of loaded vessel alongside dock was due to leaking of water through rivet holes along vessel's side, negligently permitted to remain in defective condition by owner, *held*, insurer was not liable for damages from the sinking, even if conceded to be due in part to the master's negligence.

**8. Insurance ☞402—Underwriters held liable for damages to rudder and boiler of vessel.**

Underwriters *held* liable for damages to rudder and boiler of vessel.

In Admiralty. Libel by the Chicago Steamship Lines, Inc., and the Northern Trust Company of Chicago, against the United States Lloyds, Inc., and others. Decree for libelants for part only of the recovery sought.

Kremer, Branand & Hamer, of Chicago, Ill., for libelants.

Ickes, Lord, Wire & Cobb, of Chicago, Ill., Bigham, Englar & Jones, of New York City, and Burry, Johnstone & Peters, of Chicago, Ill. (F. Bruce Johnstone, of Chicago, Ill., and D. Roger Englar and Henry N. Longley, both of New York City, of counsel), for respondents.

CARPENTER, District Judge. This action is to recover from underwriters on the theory of constructive total loss of the steamer George W. Clyde (built in 1872) as a result of her sinking alongside her dock at Little Current, Canada. It is also claimed that if not liable on this theory, underwriters are nevertheless liable for damages caused by the sinking. There are also partial loss claims for damage to rudder and boilers prior to the sinking.

The libel was filed by the owner, Chicago Steamship Lines, Inc., and Northern Trust Company of Chicago, a mortgagee. J. C. Hoskins was president of the owner corporation. The master of the vessel was Capt. Goodrow.

All the policies sued upon named R. Parry-Jones of Cleveland as underwriters' surveyor, and directed that he be notified in event of any loss. Parry-Jones has been for many years in charge of the Great Lakes district on behalf of the Salvage Association, a concern organized for the benefit of English underwriters and having its headquarters in London.

On Saturday, August 25, 1923, the Clyde loaded a cargo of print paper at Little Current, Canada. Half an hour after loading was completed, she commenced to list to port and continued listing slowly for about an hour until she leaned against the dock. Then for 10 to 20 hours she gradually settled until she rested on the bottom. The water was clear and about 25 feet deep. She lay practically on an even keel in a sheltered position. Her upper deck was entirely out of water. There was neither wind nor current and the weather was fair. Except for some boulders under the bow, the bottom was firm and smooth. The Clyde was 256 feet in length, and 22 feet from the stem the ship rested on a 4-foot rock. Forty-six feet from the stem, and from there on aft, she lay practically on an even keel. The only sign of damage to the hull was one hole in the bottom caused by settling down on the 4-foot rock.

On Sunday, August 26th, the master notified Hoskins in Chicago of the sinking. Hoskins thereupon telegraphed that fact to Parry-Jones in Cleveland, saying nothing about abandonment. On Monday Hoskins wired the master asking the cause of the sinking. Goodrow replied that the cause was unknown. On the same day Hoskins wrote Parry-Jones confirming his telegram

and adding that the Clyde had been abandoned to underwriters.

On receipt of the telegram announcing the sinking, and before abandonment had been suggested, Parry-Jones solicited bids for raising the vessel. On Wednesday evening, August 29th, Capt. Reid, a salvor, arrived at Little Current. He learned from the master how long the Clyde had taken to settle, and that same night made Parry-Jones a "no cure no pay" bid by telegraph. He raised her in three days. To use his expression, "The whole affair was a mere pumping job."

### Abandonment.

It is contended by respondents that no abandonment was made to underwriters: First, because Parry-Jones was not the proper person to receive the notice, he being underwriters' surveyor, and not being agent of the insurers, within the meaning of the policy; second, because the letter of August 27, 1923, was merely a report made to Parry-Jones that the Clyde had already been abandoned; and, third, because the alleged abandonment was not joined in or ratified by the Northern Trust Company, the mortgagee. The Northern Trust Company not only did not join in the abandonment, but several weeks thereafter it commenced proceedings in this court to foreclose its mortgage on the vessel, and it is at least doubtful whether under these circumstances the abandonment was effectual. In the view I have taken of the case, however, it is not necessary to decide any of the foregoing questions.

### Acceptance of Abandonment.

Libelants insist that the underwriters raised the vessel and that this action constituted an acceptance of abandonment. While the contrary might be urged with some force, I am assuming for the purpose of this opinion that Capt. Reid of the wrecking company was the agent of the underwriters. Did their conduct constitute an acceptance of abandonment?

The sue and labor clause of the policies, which covers also the matter of abandonment, provides as follows:

"And it is especially declared and agreed that no acts of the insurer or insured shall be considered as a waiver or acceptance of the abandonment."

[1] This provision is in the public interest. It leaves both insurer and insured free to act for the safety of the vessel without prejudice to their respective rights under the policy. Neither party, however, is permitted to take refuge under this clause from the consequences of inconsistent conduct. The acts which are protected are those reasonably tending toward the recovery of or the safety of the vessel. In my opinion the mere raising of the Clyde did not constitute an acceptance of abandonment.

[2] Libelants insist, however, that having raised the vessel, the underwriters were bound to repair, and could not tender her back in damaged condition.

I have examined the cases cited by libelants in support of this position, commencing with the leading case of Peele v. Merchants' Insurance Co., 19 Fed. Cas. 98, decided by Mr. Justice Story in 1822. As I read them, they do not sustain libelants' contention. In the Peele Case the question was whether underwriters had a right, without consent of the owners, to take possession and management of the ship and afterward to repair the ship for owner's account. Justice Story held that the underwriters had no such right and must be deemed to have accepted the abandonment which had been duly tendered. In the instant case, however, the policies give the underwriters no right to make repairs. They at no time took possession and control of the ship, but, on the contrary, the ship remained constantly under the control and direction of the owner and its master.

In Richelieu Navigation Co. v. Boston Ins. Co., 136 U. S. 408, 10 S. Ct. 934, 34 L. Ed. 398, where a judgment in favor of underwriters was sustained, the Supreme Court held that the acts of the underwriters in sending a wrecking party, taking possession of, and repairing the vessel, did not amount to an acceptance of abandonment. The court said (page 433 [10 S. Ct. 941]):

"Whether the insurer accepts or not is a matter of construction of his words and conduct. Any act done for the purpose of making the most of the property, to whomsoever it may prove to belong, ought not to be construed against the party who thus seeks the common interest."

In the absence of a provision to the contrary in the policy of insurance, the underwriters cannot be punished for trying to minimize the damage.

In Peele v. Merchants' Insurance Co., supra, Justice Story said, 19 Fed. Cas. at page 119:

"If after abandonment, the owners were to proceed to repair the ship without consultation with the underwriters, it would be a waiver of the abandonment, because it would be doing an act inconsistent with the

asserted transfer of ownership. It would deprive the underwriters of the right of electing whether to repair the ship or not, and thus compel them to spend their money in a way which they might deem useless."

The alleged abandonment took place on August 27th. Hoskins, president of chief libelant, however, at no time relinquished control of the vessel. His master and his crew remained continuously on board. From the moment of sinking, Hoskins directed every movement. He was in constant telegraphic communication with the master; he ignored Parry-Jones' suggestion that the Clyde be dry-docked at Ecorse and ordered her to Manitowoc, 50 miles further away from the scene of disaster; he solicited and obtained a cargo late in September; he hired his own surveyors at South Chicago to check up damages with the underwriters' surveyors; he caused her to be repaired for the purpose of going after his promised cargo; he exercised an owner's privilege in making temporary instead of permanent repairs; he solicited insurance, both on the vessel and on expected profits on freight; he requested survey for "class" by the American Bureau; and, finally, he attempted to sell a half interest in the vessel.

On October 2, 1923, when a receiver was appointed in proceedings brought by the Northern Trust Company to foreclose its mortgage on the Clyde, the Chicago Steamship Lines, Inc., appeared by its representative in open court as the owner of the vessel. It was only after classification had been refused on October 15th, seven weeks after the alleged abandonment of August 27th, that abandonment was again suggested by the owner.

[3] Hoskins' conduct was a complete waiver of his abandonment.

Respondents insist that having waived abandonment, the owner is now precluded from urging a constructive total loss. The position is logically sound, but its adoption is not necessary for the purpose of this decision, and I prefer to deal with the question of constructive total loss on its merits.

#### The Clyde Was Not a Constructive Total Loss.

A careful consideration of the testimony taken in this case has convinced me that Hoskins, president of and acting for the owner, was not warranted in abandoning the vessel to the underwriters.

[4] In a case of sinking it is the duty of the insured, as I conceive it, to make prompt and adequate investigation, both to determine the cause of the disaster and the possibility and cost of raising and repairing the vessel. If such investigation satisfies the owner that the vessel sank by reason of one of the perils insured against, and that it would cost more than the stipulated amount to raise and repair it, he has the right to abandon the vessel to underwriters. He is not entitled, without investigation, and without due foundation of fact or extreme probability of fact, to throw the burden upon the insurers. In the present case, Hoskins made no investigation before attempting abandonment.

The policy provides: "No abandonment shall in any case be effectual unless the amount of the loss exceeds 75 per cent. of the combined value in this policy as set forth above." This combined value was $100,000. Therefore, the loss must exceed $75,000—either actually or in high probability—to make an abandonment effectual.

[5] There are cases holding that the question is purely one of fact, but the Court of Appeals for this circuit, in its decision in the Argo Case (Royal Exchange v. Graham & Morton Co.) 166 F. 35, 92 C. C. A. 66, has recognized the so-called "high probability" rule, and I am not permitted to depart from it.

[6] The record shows that the cost of raising the Clyde, discharging her cargo, and repairing the damages caused by the sinking, would not exceed $21,000. The salvor's bill was $6,300, and the cost of unloading cargo about $4,400. The damages caused by the sinking could have been repaired for about $10,000. Andrews, the only witness who testified for libelants on this question, put the amount at $36,000. He was unable, however, to defend this figure on cross-examination. Andrew's complete list of repairs was checked over by respondents' witnesses, who testified that they could have been made for $10,000.

Pommer and Colton, marine experts, who testified it would have cost $75,000 to $85,000 to restore the Clyde, admitted that they were figuring on a restoration sufficient to warrant reclassification by the American Bureau. The Clyde's classification had expired in April, 1923. Although examined that month for the purpose of renewing her certificate (and before the insurance policies involved herein were written), she was unable to obtain classification. On August 1st, when examined by a government inspector at Sturgeon Bay, she was found to be badly corroded. Because of her corroded condition, she was refused class at South Chica-

go after repairs had been completed in October, 1923. Respondents, however, were not obliged to put her in shape for reclassification. If liable at all, they were liable only for the amount required to make good such damages as were actually caused by the sinking.

When questioned on the high probabilities of the situation, the cost of raising the vessel, discharging cargo, and repairing damage was placed by respondents' witnesses at amounts ranging from $15,000 to $30,-000. None of libelants' witnesses testified that the loss would reach $75,000. Several of them swore that, had they been the owner of the Clyde under the circumstances, carrying $100,000 of insurance, they would have abandoned the vessel; but this is not the question. On this issue of high probability, therefore, I find with respondents.

## The Loss Was Not Covered by the Policies.

[7] Libelants contend that if not liable on the theory of a constructive total loss, the underwriters must at least respond to the extent of the damages caused by the sinking. This depends on whether the loss fell within the provisions of the policy.

The sinking of the Clyde was directly due to water leaking through rivet holes along the vessel's side a few inches below the load water line. The water found its way into a gutter along the lower deck, but, there being no scuppers, instead of running down into the bilge, where it could have been reached by pumps, was soaked up by the cargo—the rolls of paper—thereby causing the list, which increased until the vessel sank.

The Clyde had been taken to Sturgeon Bay in July prior to the sinking at Little Current, when a new lower gangway was cut in the port side forward and a compensating or doubler plate 26 feet long was applied below the new opening. The work was defectively done. The plan approved by the American Bureau required that this doubler plate be applied flat against the skin of the vessel. Instead, it was lapped over the fender strake, leaving an open space under the plate. The work was neither lined nor caulked; old rivets were burned out and new ones inserted through the old rivet holes. The work was not tested for water tightness.

Libelants contend that the sinking was caused by the negligence of the master in overloading the vessel, and they rely necessarily upon the Inchmaree clause, which in these policies reads as follows:

"This insurance also specially to cover * * * loss of, or damage to, the hull * * * through the negligence of master, mariners, * * * provided such loss or damage has not resulted from want of due diligence by the owners of the vessel, or any of them, or by the manager."

Respondents insist that the sinking was caused by the defective work done at Sturgeon Bay under the direction of the owner, and they rely upon the rule laid down by the United States Supreme Court in Union Insurance Co. v. Smith, 124 U. S. 405, at page 427, 8 S. Ct. 534, 546 (31 L. Ed. 497):

"A defect of seaworthiness, arising after the commencement of the risk, and permitted to continue from bad faith or want of ordinary prudence or diligence on the part of the insured or his agents, discharges the insurer from liability for any loss which is the consequence of such bad faith, or want of prudence or diligence; but does not affect the contract of insurance as to any other risk or loss covered by the policy and not caused or increased by such particular defect."

The work on the Clyde at Sturgeon Bay was done under the direction and personal supervision of Hoskins. He submitted the plans and saw they were not followed. There is no dry dock at Sturgeon Bay, and the Clyde was afloat and light. Hoskins told the repair men that the entire doubler plate would be above load water line. He knew or should have known this to be contrary to fact. The master objected to the 1,200-ton load awaiting at Little Current, and Hoskins overruled him. The master asked for additional ballast in the after hold. Hoskins promised to install it, and failed to do so. Hoskins hurried the Clyde out of Sturgeon Bay, leaving the work unfinished, the doubler plate uncaulked, and the rivets untested, because he was anxious to get to Little Current for his cargo.

In my opinion libelants have failed to meet the proviso of the Inchmaree clause, because the loss in fact resulted from the negligence of the owner. If it be conceded that the negligence of the master contributed to that loss, it was, however, the leaking rivet holes which were the causa sine qua non. The Supreme Court, in the rule laid down in Union Insurance Co. v. Smith, supra, recognizes that there may be other causes contributing to a loss, but denies relief to the owner unless he can show that his negligence did not increase the hazard. The Clyde was laden well within the limits

of safety, save for the defective riveting, for which Hoskins was responsible. Under this rule laid down by the Supreme Court, therefore, I hold that the loss was not covered by the policy.

### Rudder and Boiler Losses.

[8] Shortly after the insurance became effective, and on the 21st of June, 1923, the Clyde, then about to depart on a voyage from Ecorse to Little Current, Ontario, Canada, got under way, moved out of the slip in which she had been lying, and in doing so the current of the Detroit river caught her stern, swinging it with considerable violence against the dock below the slip, so that the rudder came into collision with the dock, with the result that the rudder stock and blade were bent, and a gudgeon and socket on the stern post were broken, so disabling the steamer that she was compelled to go into dry dock to make repairs, where she remained for two or three days.

After the repairs to the rudder and while the Clyde was on her voyage from Little Current to Chicago, and when she was in Lake Michigan, at North Manitou Island, on the 30th day of June, 1923, the furnace of one of her two boilers fell, and it became necessary to draw the fires so that the boiler became useless. The steamer proceeded with steam from the remaining boiler for some hours, when that furnace also dropped, leaving the steamer without steam. Shortly after she was picked up drifting in the lake and towed into Manistee, Mich. Afterwards she was towed to the port of Chicago, where repairs on the boilers could be and were made. Claim is made for $2,127 for rudder damage and for $6,258.53 boiler damage.

There is some controversy in this case as to whether the insurance company was properly notified of the loss, and whether proper proofs were submitted according to the terms of the policies. However, it appears from the record that an agent of the underwriters refused to approve of the damage claim of $2,127, and declined to allow the claim of $6,258.53, but was willing to allow it to the extent of $3,500.

Under the circumstances I find the underwriters liable for the partial loss, and there will be a reference to the commissioner to determine the extent of the rudder and boiler damage.

Let a decree be prepared accordingly.